## Commonwealth v. Gordon, Appellant.

Argued March 15, 1968. Before MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*A. C. Troiano,* with him *Daniel T. Zamos,* for appellant.

*Charles B. Watkins,* Assistant District Attorney, with him *Robert W. Duggan,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, October 3, 1968:

Garfield Gordon was convicted by a jury of murder in the first degree and the punishment was fixed at life imprisonment. Post-trial motions were denied and sentence imposed as the jury directed. Gordon appeals from the judgment. The sufficiency of the evidence is unquestioned, but it is urged that several trial errors constituted a denial of due process of law.

On July 8, 1966, at about 11 a.m., a retail jewelry shop located on the second floor of the Plaza Building in downtown Pittsburgh was held up by two armed robbers. The operator of the establishment exchanged gunfire with the felons and was fatally shot. Gordon and two others were arrested and charged with robbery and murder.[1]

The first and principal assignment of error concerns the admission of certain evidence at trial.

The pertinent facts may be summarized as follows:

Immediately after the crime, police officers recovered on the scene, inter alia, a rubber face mask, fragments of glass from a broken showcase and a paper bag containing adhesive tape. The mask contained strands of hair and the paper bag was bloodstained.

At about noon on July 8th, one hour after the crime, Gordon appeared with William Murray[2] at the home of Gordon's brother. Gordon was seriously wounded and bleeding. Shortly thereafter, he was taken to his mother's home. At about 4:20 p.m., police officers arrived there, took him into custody and arranged for his immediate transfer by ambulance to the Allegheny General Hospital.

Upon his arrival and while in the emergency room, a sample of his blood was taken by a hospital techni-

---

[1] All three in separate jury trials were convicted of murder in the first degree and sentenced to life imprisonment.

[2] Murray was one of those convicted of participating in the crime.

cian for typing purposes in case a transfusion was necessary. Shortly thereafter, two police officers, without a warrant, obtained a sample of Gordon's blood from a doctor in the hospital's emergency room. They also removed Gordon's bloodstained clothes. The clothes and the blood sample were later turned over to the police crime laboratory. That night, Gordon was operated on for two bullet puncture wounds of the body, one in the abdomen.

At about noon on July 9th, two police detectives arrived at the hospital, without a warrant, and arranged for a nurse to enter Gordon's room and comb his hair with a new comb which they supplied. She ran the comb through his hair approximately ten times before any hair attached itself to the comb. She did not ask Gordon's permission. At the time, he was under sedation for pain, although he was aware of what the nurse was doing, but not the purpose, and conversed with her coherently. The comb and the hair were given to the detectives who delivered both to the police crime laboratory.

At trial, testimony was introduced to establish: (1) that the blood on the paper bag recovered at the scene of the crime and the blood on the clothes taken from Gordon's body at the hospital was in each instance human blood, Type A; (2) that the hair combed from Gordon's head in the hospital "displayed the same color, thickness, distribution of pigmentation, medullation and a presence of an unusually high concentration of vacuoles . . . ." as the strands of hair found on the face mask recovered at the scene of the crime; and (3) that broken glass particles found in an automobile used by the robbers to escape and later recovered by the police had the same physical characteristics as glass particles found on the scene of the crime and on the shoes of Gordon which were seized at the hospital.

It is now argued that the evidence upon which this testimony was based was secured in violation of Gordon's rights under the Fourth and Fourteenth Amendments and that it should have been excluded.

It should be noted initially that, at trial, the testimony now challenged was not objected to on the ground it violated Gordon's rights under the Fourth Amendment. It was specifically and solely objected to for the reason that it allegedly violated Gordon's right against self-incrimination secured by the Fifth Amendment. It is clear that the evidence involved was not obtained through testimonial compulsion or enforced communication, and hence, was not inadmissible on privilege grounds. Cf. *Schmerber v. California,* 384 U.S. 757, 86 S. Ct. 1826 (1966). And it has long been the rule in this state that where the introduction of evidence is objected to at trial for a specific reason, other reasons are waived and may not be asserted post trial for the first time. *Commonwealth v. Raymond,* 412 Pa. 194, 194 A. 2d 150 (1963). However, we refrain from resolving the issue on this basis.

As far as the blood received at the hospital by the police officers is concerned, this was not the product of a search and seizure protected by the Fourth Amendment. It is true that in *Schmerber v. California,* supra, the Court held that blood taken from an accused *at the direction* of the police constituted a search. But this is not the instant case. Herein, the blood was not extracted from Gordon at the direction or request of the police. As noted previously, it was extracted by a hospital employee purely for medical reasons and before any police contact occurred with the hospital employees involved. The police were in no way connected with the extraction, and merely received from the hospital a sample of blood already on hand and extracted for proper purposes.

As far as the clothes and shoes, taken from Gordon's person by the police at the hospital, are concerned, this clearly was a seizure protected by the Fourth Amendment. However, despite the absence of a search warrant, we are not persuaded the admission of testimony at trial relating to these items violated Gordon's constitutional rights.

The lawfulness of Gordon's arrest is not questioned. Hence, the police had the legal right to seize without a warrant any "evidentiary materials" if the seizure was incidental to the arrest. *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S. Ct. 1642 (1967); *Commonwealth v. Aljoe,* 420 Pa. 198, 216 A. 2d 50 (1966); and *Commonwealth v. Harris,* 429 Pa. 215, 239 A. 2d 290 (1968). It is true that to be valid such a seizure must be substantially contemporaneous with the arrest and confined to the immediate vicinity thereof. *Stoner v. California,* 376 U.S. 483, 84 S. Ct. 889 (1964), and *Commonwealth v. Harris,* supra. However, circumstances may exist which will render a seizure reasonable, even though it is not strictly confined to the area of arrest or the immediate time thereof. In our view, this is such a case.

If the police seized Gordon's clothing and shoes at the time he was taken into custody in his mother's home, the seizure would unquestionably be incidental thereto. But he was then seriously wounded and his condition dictated immediate transferal to a hospital. Common sense required that the seizure of his clothes be delayed until after his arrival at the hospital. It was effected within minutes after his arrival. It was, we believe, one substantially unbroken transaction. Under such circumstances, we are unpersuaded the seizure was unreasonable. Cf. *People v. Webb,* 56 Cal. Reporter 902, 424 P. 2d 342 (1967); *State v. Anderson,* 148 N.W. 2d 414 (Iowa S. Ct. 1966); and, *State v.*

*Schwartzenberger,* 422 P. 2d 323 (Wash. S. Ct. 1966).

Whether or not the combing and obtaining of a sample of Gordon's hair in the hospital under the existing circumstances constituted a search and seizure of his "person" within the meaning of the Fourth Amendment is a most interesting and unusual question, but we need not reach it. After a careful consideration of the record, we are convinced that if the securing of this evidence involved an unjustifiable intrusion of Gordon's person, the expert testimony concerning its analysis and comparative qualities was harmless. We are not unmindful that before an error of constitutional proportions (assuming such is the case) is harmless, it must appear beyond a reasonable doubt that the evidence erroneously admitted did not contribute to the conviction. *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824 (1967), and *Commonwealth v. Pearson,* 427 Pa. 45, 233 A. 2d 552 (1967). We are so persuaded for two reasons: (1) The expert trial testimony, concerning the comparative qualities of the sample of hair combed from Gordon's head and the strands of hair found on the face mask recovered at the scene of the crime, was inconclusive and anything but weighty;[3] and (2) The other proof of guilt was so overwhelming that this particular evidence was of little moment.

An eyewitness to the robbery positively identified Gordon as one of the two armed participants.[4] Two police officers positively identified Gordon as one of

---

[3] The witnesses, who gave this testimony, candidly admitted under cross-examination, the "tests are not positive or absolute" and "it [the hair] could have come from any other number of persons."

[4] This witness, a maintenance employee in the Plaza Building, accidentally came upon the robbers before their masks were donned. He was forced at gun point to accompany them into the robbed shop.

two men they saw fleeing down the street from the building, wherein the jewelry shop was located, immediately after the robbery occurred. They testified to retrieving a loaded gun one of these two men dropped while in flight. Another individual, who was in an office in the Plaza Building near the jewelry shop, heard unusual noises emanating therefrom and then saw two masked men fleeing down the hallway from the direction of the robbed jewelry shop with one holding his abdomen. One hour after the robbery, Gordon appeared at his brother's house, wounded and bleeding. He had been shot in the abdomen. Shortly thereafter, Gordon spontaneously mentioned to other relatives that he had been in a robbery where someone had been killed. When Gordon and Murray arrived at the house of Gordon's brother, Murray was in possession of two guns, later seized by the police. In view of the above proof, we repeat, the testimony under discussion was of little moment.

The next assignment of error asserts Gordon was prejudiced by the denial of cross-examination of a witness offered at trial against him. This situation arose in the following manner.

Immediately after the crime occurred, an F.B.I. Agent was informed by his office of the robbery and given a description of an automobile seen outside the Plaza Building immediately prior to the commission of the crime and thought to have been used by the robbers in effecting their escape. Shortly thereafter, while driving his own automobile, he saw an automobile fitting the description given him and he followed it for some distance. During the examination of this witness, John Lee Smith, who was jointly indicted with Gordon for the crime involved, was taken into court at the instance of the Commonwealth and positively identified as the driver of, and one of three Negroes

in the automobile. It is argued this constituted the offering of Smith as a witness against Gordon without the opportunity of cross-examination, contrary to the ruling in *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065 (1965), and violative of the constitutional right of "confrontation." We do not agree.

It was the testimony of the F.B.I. Agent with which Gordon was confronted and there was no undue limitation on the right of cross-examination of this witness. Morever, we see no error in permitting the Commonwealth the opportunity of identifying other alleged participants in the crime. See *Commonwealth v. Murrano*, 276 Pa. 239, 120 A. 106 (1923).

The final assignment of error maintains the trial court erred in not granting a motion for the withdrawal of a juror following an improper prejudicial statement by the district attorney during his summation to the jury.[5]

We are of the view that the statement was completely out of order and not in keeping with the trial conduct expected of a responsible prosecuting attorney. However, we do not deem the incident sufficient to warrant the grant of a new trial.

Judgment affirmed.

Mr. Chief Justice BELL took no part in the consideration or decision of this case.

---

[5] During summation the district attorney asked: "Did you see those eyes on that killer?"