Commonwealth *v.* Marino, Appellant.

Argued January 14, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

246

reargument refused August 4, 1969.

*B. Nathaniel Richter,* for appellant.

*James D. Crawford,* Assistant District Attorney, with him *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, June 27, 1969:

Francis Marino, Arthur Ashkenase and Salvatore Rispo, Jr., were found guilty in Philadelphia of the crimes of blackmail and conspiracy following a joint trial before the Honorable EDMUND B. SPAETH, JR., sitting without a jury. Post-trial motions were denied and judgments of sentence were imposed. On appeal, the Superior Court unanimously affirmed the convictions and judgments entered against Ashkenase and Rispo. In the case of Marino, the Superior Court likewise affirmed, but Judge WATKINS filed a dissenting opinion in which Judge HOFFMAN joined. See 213 Pa. Superior Ct. 88, 245 A. 2d 868 (1968). Petitions for allowance to appeal from the order of the Superior

Court were filed in this Court on behalf of all of the defendants, but only that of Marino was granted. We concluded to review the Marino conviction because of our concern that the use at trial of certain evidence identifying him as one of those involved in the crimes was violative of due process of law. However, after a careful study of the record and pertinent decisions, we now affirm.

The facts established by the record, as set forth in Judge MONTGOMERY'S opinion for the Superior Court, are as follows:

"Between July, 1965 and November, 1966, defendant Ashkenase loaned to Morris B. Singer, who operated a haberdashery store in Bucks County, Pennsylvania, various sums of money totaling $4,150. By November, 1966 Singer had repaid $1,650 leaving a balance of $2,500 plus interest. Nevertheless, in November, 1966 Ashkenase demanded $8,800 claiming that was the amount still owing to him. . . .

" 'On Tuesday, November 8, 1966, defendants Ashkenase and Rispo went to Singer's place of business in Fairless Hills, Bucks County, Pennsylvania. Singer testified that he was informed by Rispo that "Ashkenase was paid off," and that he now owed Rispo "and his people the sum of $10,000." Rispo threatened to kill Singer and Singer's wife if the "debt" were not paid immediately.

" 'Rispo told Singer to dial a Philadelphia telephone number, saying that "a girl will probably answer 'The Teamsters' " and telling him to "ask for the 'Big Man' ". Singer dialed the number but was too frightened to talk, and so gave the telephone to Rispo. After Rispo had said a few words he returned the telephone to Singer. The man from the Teamsters told Singer that Ashkenase had been paid and that Singer had better come up with $10,000.00, and he asked how much money

Singer had on him. After the telephone conversation, Rispo took from Singer $250.00 in cash, a diamond ring, and a watch. He again threatened Singer and told him that they would call him that evening to set up a meeting. When Singer said that he had recently had his telephone number changed, Rispo replied "Don't worry. We know everything. We'll know your number." Before leaving, Rispo again warned Singer: "Don't f---- with us because we're big people and there is nobody bigger than us. You heard about what happened over at 107."

" 'That evening the "Big Man" telephoned Singer at his home, informing him that he had better have $4,500.00 by Friday morning. [As will appear, the "Big Man" was defendant Marino.] After this call, Singer went to the Philadelphia District Attorney's Office, where he told Sgt. McLellan the whole story.

" 'Nothing happened on Wednesday, November 9. On Thursday, November 10, Singer received another telephone call at his home from the "boss." Detective Kelly and Mrs. Singer were present. Singer repeated the conversation to the detective. Approximately 15 minutes later, Rispo telephoned and again threatened Singer. Finally, about 15 minutes after Rispo's call, the "Big Man" telephoned again. He told Singer that they were going to have a meeting the next morning and that Singer would receive directions by telephone at exactly 8:00 a.m.

" 'At 8:00 a.m. on Friday, November 11, Singer was telephoned and was told by the "Big Man" to go to Lerner's Restaurant where, he was told, he would see someone he knew.

" 'Sgt. McLellan and three detectives were present in Singer's apartment when this call was received, and they accompanied Singer to the restaurant. They instructed Singer to signal them by pulling his handker-

chief from his pocket if at any time he felt that he was in danger.

" 'Detective McLaughlin and Detective Lynch entered the restaurant before Singer. Detective Lynch saw defendant Rispo seated alone in the rear of the room. Moments later he saw defendant Marino go over to Rispo's table, engage in a few words of conversation, and then go to the counter and order breakfast. Detective Lynch knew Marino was from Teamsters Local 107.

" 'When Singer arrived at the restaurant, he proceeded to the table where Rispo ["the man he would know"] was and sat down across from him. At approximately the same moment, Marino walked to within three feet of Rispo's table, as if to join them, but stopped, turned quickly, and sat down at the adjacent table, directly next to Singer. The officers observed Rispo motion to Singer, and heard him tell Singer to "move the f---- over here [next to Rispo] or I'll . . . ." Sweating profusely, Singer pulled his handkerchief from his pocket and the officers moved in.

" 'Sgt. McLellan placed Rispo under arrest. At this time Detective Lynch informed Sgt. McLellan that Bobby Marino from the Teamsters was with Rispo. Sgt. McLellan testified that he had noticed Marino because of his size—a "great big man"—and that it was common knowledge in the Police Department Labor Union and Labor Squad that Marino was known as "Big Bobby."

" 'Aware of the foregoing facts, and ". . . knowing that there had been more than one man involved in this thing," Sgt. McLellan placed Marino under arrest.

" 'Marino was taken to Room 708A in City Hall, where preliminary arrest reports were made out. Detective Lynch warned Marino of his right to remain silent and asked him no questions beyond those neces-

sary to make out the routine arrest reports. No attempt was made to interrogate him.

" 'Within Room 708A, a partition about five feet high separates Sgt. McLellan's office from a conference room. Singer was in the office with Sgt. McLellan. On the other side of the partition, Marino and Rispo and Detective Lynch *and other police officers* were engaged in general conversation about policemen working extra hours, truckers' strikes, etc. [No reference was made to the complaint in this case.] They spoke thus for approximately 15 to 20 minutes. Singer did not know who was on the other side of the partition in Room 708A. Upon hearing the general conversation on the other side, Singer jumped up excitedly and informed Sgt. McLellan "That's the voice on the phone. Whoever is over there is the voice on the phone." Sgt. McLellan asked Marino to come out and talk again and Singer made a positive identification.' "[1]

The issue which disturbs us concerns the admissibility at trial of the testimony concerning Singer's identification of Marino as the person who threatened him over the phone, such identification occurring after Singer heard Marino's voice in the police station following Marino's arrest. Marino asserts that this evidence should have been excluded because it was obtained under circumstances which violated his constitutional rights in several respects. He contends: (1) that the police procedure of subjecting him to an audition of his voice for identification purposes without his consent and in the absence of counsel violated his rights under the 5th and 6th Amendments; (2) that his arrest without a warrant was illegal because it was not based on probable cause, and the subsequent

---

[1] Marino and Rispo did not testify at trial. In his trial testimony, Ashkenase admitted hiring Rispo and Marino to collect the debt from Singer.

occurrences were the product of and tainted by the initial illegality; and (3) that the identification procedure was conducted with such fundamental unfairness that it deprived him of due process of law.

Contention No. 1, supra, can be disposed of without difficulty. While the 5th Amendment, as implemented by the 14th Amendment, protects the right of an individual "from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature" (*Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826 (1966)), that amendment offers no protection against compulsory submission to speak for identification purposes. *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926 (1967); *Schmerber v. California*, supra; *United States ex rel. Johnson v. Rundle*, 280 F. Supp. 453 (E.D. Pa. 1968). See also *Commonwealth v. Gordon*, 431 Pa. 512, 246 A. 2d 325 (1968). Likewise, while *United States v. Wade*, supra, ruled that the 6th Amendment right to counsel applies to lineup procedures (assuming arguendo that the situation here presented falls into this category), the ruling in *Wade* is not retroactive and controls only in "those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel" after June 12, 1967. *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967 (1967), and *United States v. Lipowitz*, 401 F. 2d 591 (3d Cir. 1968).[2] Since the identification and confrontation here involved preceded *Wade*, the ruling therein does not control here, and the absence of counsel for Marino at the time he was identified by Singer did not of itself render the testimony inadmissible.

---

[2] For *Wade* to apply, the prohibited practice (i.e., the lineup without the accused having the assistance of counsel) must have occurred prior to June 12, 1967, the effective date of *Wade*. *Jenkins v. Delaware*, 395 U.S. 213, 137 L.W. 4458 (1969).

The next question is whether or not the arrest of Marino was illegal. We conclude that it was not.

A police arrest without a warrant is constitutionally permissible if based on probable cause. This means that "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in believing that the suspect had committed or is committing a crime." *Carroll v. United States,* 267 U.S. 132, 45 S. Ct. 280 (1925). See also, *McCray v. Illinois,* 386 U.S. 300, 87 S. Ct. 1056 (1967), and *Commonwealth v. Brayboy,* 431 Pa. 365, 246 A. 2d 675 (1968).

When the police arrested Marino they knew and had trustworthy information which would lead a reasonably cautious man to believe: (1) that a conspiracy was in progress to extort illegally a large sum of money from Singer through use of threats and force by Rispo and an accomplice identified as the "Big Man"; (2) that the then unknown accomplice was a teamster connected with Local 107; (3) that Marino was a teamster connected with Local 107 who, because of his size, was known as "Big Bobby" in labor and police circles. Additionally, they also had witnessed Marino talking with Rispo, the known extortionist, in the restaurant immediately before Singer arrived there to discuss payment of his indebtedness pursuant to instructions received from the "Big Man" over the telephone. They also saw Marino proceed to the table where Rispo and Singer were seated as if to join them, but quickly change his mind, take a seat at a table next to Rispo within earshot of the conversation at the Rispo-Singer table. These facts, when all taken together, were certainly sufficient to warrant a reasonable person in the belief that Marino probably was the "Big Man" in the extortion plot.

While it is true that suspicion and conjecture do not constitute probable cause (*Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509 (1964)), it is equally true that probable cause means less than evidence which would justify conviction: *United States v. Ventresca*, 380 U.S. 102, 85 S. Ct. 741 (1965). It is only the probability, and not a prima facie showing, of criminal activity that is the standard of probable cause. *Beck v. Ohio*, 379 U.S. 89, 85 S. Ct. 223 (1964).[3]

The final question requiring discussion is whether or not the procedure whereby Marino's identification was secured was constitutionally conducted. For while the use of evidence secured as the result of a police lineup or its equivalent in the absence of counsel for the accused, prior to *Wade*, supra, is not constitutionally proscribed per se, still it may be that the procedure used by the police was conducted with such fundamental unfairness as to result in a deprivation of due process of law. *Stovall v. Denno*, supra. This is a recognized ground of attack, independent of any right to counsel claim. In resolving this question, all of the circumstances must be considered and the test is whether or not "the confrontation was so unnecessarily suggestive and conducive to irreparable mistaken identification . . . ." as to constitute prejudicial unfairness. *Stovall v. Denno*, supra. See also, *Biggers v.*

---

[3] In view of our conclusion that probable cause existed, we need not reach the question of whether or not an illegal arrest constitutionally tainted the subsequent identification procedure. Moreover, under the circumstances of this case "the fruit of the poisonous tree" doctrine has no relevance. Cf. *Gilbert v. California*, 388 U.S. 263, 87 S. Ct. 1951 (1967). *Gilbert* requires a reversal where a witness testified in court that he previously identified the defendant in a lineup, which lineup was unconstitutionally conducted. Since, however, we conclude that the pretrial identification of Marino was not constitutionally offensive, we are not confronted with "the fruit of the poisonous tree" problem of *Gilbert*.

*Tennessee,* 390 U.S. 404, 88 S. Ct. 979 (1968), and *Simmons v. United States,* 390 U.S. 377, 88 S. Ct. 967 (1968). Our study of the record and pertinent circumstances persuades us that no violation of due process occurred.

At the time involved, Marino was not forced to speak and had in fact been told that he could remain silent. No questions were asked about, or reference made to, the crimes with which he was charged. Several individuals were in the same part of the room and all were engaged in general conversation. Singer did not know who was on the other side of the partition. He was able to and did hear several different voices. His identification was a spontaneous act. Clearly, this was not a situation conducive to an unfair identification. The weight of Singer's testimony was for the jury. Cf. *Golliher v. United States,* 362 F. 2d 594 (8th Cir. 1966).

Order affirmed.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I must strongly dissent to the majority's approval of the voice identification of the appellant. I believe that the circumstances surrounding Singer's identification of the appellant were a violation of appellant's rights under the fourteenth amendment. Consequently, I would reverse his conviction since his indictment and conviction were a result of this tainted identification.

First, I believe that a restatement of the relevant facts is necessary. After Marino's arrest he was taken to room 708A in Philadelphia City Hall and engaged in conversation with a codefendant and the arresting officer. He was advised of his right to counsel and his right to remain silent. Although Marino willingly participated in the conversation, he was *unaware* that

the complaining witness and Sergeant McLellan, another arresting officer, sat on the other side of a five foot tall partition in the same room with an open space above it. But Sergeant McLellan knew that Marino was on the other side of the partition before any identification was made. In addition, the complaining witness himself knew precisely why he was there. He testified that he was in that room "for identification purposes."

After fifteen or twenty minutes of conversation involving appellant, the complaining witness jumped up and stated: "That's the voice on the phone [which had threatened him]. Whoever is over there is the voice on the phone." Thereupon, Sergeant McLellan asked Marino to come out and talk again in the presence of the complaining witness. The latter then made a second identification which he stated was based solely on hearing Marino's voice.

The majority opinion states "No questions were asked about, or reference made to, the crimes with which he [appellant] was charged." While it is true that nothing so blatantly suggestive was included in the conversation, it is clear that Marino was discussing truckers' strikes with the other parties; Singer, the complaining witness, knew that the person who threatened him was affiliated with the Teamsters' Union. In addition, the majority implies that appellant's voice was identified from several other voices, all of which were unknown to Singer. In fact, Singer was well acquainted with the two other voices, the codefendant's and the arresting officer's. Thus the only voice which Singer could identify as the unknown "voice on the telephone" was the one which was unfamiliar to him. Finally, the majority concludes that "his [Singer's] identification was a spontaneous act." The majority would lead us to believe that Singer was casually sit-

ting in this adjoining room when he suddenly and without any prompting or other suggestive circumstances heard the voice of his unknown caller in the next room. But such an innocent interpretation of the facts surrounding the identification is belied by the record, which clearly indicates that Singer knew he had been brought to City Hall "for identification purposes."

In *Palmer v. Peyton,* 359 F. 2d 199 (4th Cir. 1966), cited with approval by the Supreme Court of the United States in *Stovall v. Denno,* 388 U.S. 293, 296 (1967), it was held that there was a denial of due process when a voice identification was made where only one voice was submitted for identification in an atmosphere that itself suggested the defendant was the guilty suspect. The *Palmer* court said "A state may not rely in a criminal prosecution . . . on an identification secured by a process in which the search for the truth is made secondary to the quest for a conviction." In *United States v. Wade,* 388 U.S. 218, 228, 87 S. Ct. 1926, 1933 (1967), the Supreme Court emphasized the inherent evils attendant to an identification which is not carried on with the utmost safeguards. "A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pre-trial identification. . . . Suggestion can be created intentionally or unintentionally in many subtle ways. And the dangers for the suspect are particularly grave when the witness' opportunity for observation was insubstantial and thus his susceptibility to suggestion the greatest."

It is my view that this same denial of due process took place under the circumstances of this voice identification. All of the various factors outlined above

created a suggestive atmosphere leading to only one possible result—Singer's identification of appellant. Marino's discussion of truckers' strikes, the fact that his was the *only unknown* voice to Singer, and that Singer knew he was supposed to make an identification, hardly created an identification procedure free of improper suggestion. This is exactly the type of confrontation so necessarily suggestive and conducive to irreparable mistaken identity that was condemned in *Stovall v. Denno*, supra.

The second identification also violated the standards established in *Palmer*, supra, first, because it was the product of the initial tainted identification. Second, Marino was directed to speak by the police so that he could be identified. Hence, the second "voice" identification was not the product of happenstance, but rather of willful police design. Finally, Marino's appearance no doubt colored what appeared as merely a voice identification. The witness knew that the person who threatened him was known as the "Big Man." Marino, who is a heavy set individual, was asked at the time of the second identification to appear in the presence of the complaining witness. It is clear that Marino's size could have influenced the witness and swayed his judgment.

I therefore conclude that the atmosphere in which the first and second voice identifications were made was improperly suggestive and violated Marino's constitutional rights under the fourteenth amendment. Such an unconstitutional procedure compels a reversal of this conviction.

Accordingly, I dissent.