**UNITED STATES of America ex rel. Francis MARINO No. H 9391,**

v.

**Alfred T. RUNDLE, Superintendent.**

**Civ. A. No. 70–2752.**

United States District Court, E. D. Pennsylvania.

July 12, 1971.

B. Nathaniel Richter, Richter, Syken, Ross, Binder & O'Neill, Philadelphia, Pa., for plaintiff.

Arlen Specter, Dist. Atty. by Mark Sendrow, Philadelphia, Pa., for defendant.

OPINION AND ORDER

FULLAM, District Judge.

Relator and two co-defendants, Arthur Ashkenase and Salvatore Rispo, were convicted after a non-jury trial on Bills Nos. 261, 363, 364, 365, 366 and 368, Philadelphia County, February Sessions, 1967, charging blackmail and conspiracy. Relator was sentenced to a total of four and one-half to nine years imprisonment. The conviction and sentence were affirmed in the state courts, Commonwealth v. Marino, 213 Pa.Super. 88, 245 A.2d 868 (1968); Commonwealth v. Marino, 435 Pa. 245, 255 A.2d 911 (1969), and the United States Supreme Court denied certiorari, 397 U.S. 1077, 90 S.Ct. 1526, 25 L.Ed.2d 811 (1970).

In this petition for a writ of habeas corpus, relator contends that his conviction was obtained in violation of his due process rights because it was based upon

a pre-trial voice identification, which was unduly suggestive.

■ The trial court heard evidence on the identification as part of the Commonwealth's case. As the case was heard without a jury, this procedure was analogous to a suppression hearing where the constitutional validity of a pre-trial identification is heard by the judge. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968). The constitutional standard to be applied to the identification is the same whether it be passed upon at a suppression hearing prior to a jury trial or at a non-jury trial.

At the trial much concern was expressed for the argument then advanced that the identification was the fruit of an illegal arrest, a point not now raised. However, a challenge to the whole identification procedure was preserved, and the state appellate courts treated it fully. Therefore, relator has not waived his right to present the issue here. Because full attention was not directed to this issue at trial, an evidentiary hearing in this Court appeared warranted, Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), and was held.

■ Since the identification occurred on November 11, 1966, prior to the decisions of the Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the requirement of those cases that counsel be present at a lineup (assuming the voice identification was equivalent to a lineup) is not applicable to this case. The cited cases apply only to lineups held after June 12, 1967. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

The facts surrounding the challenged identification are as follows. Morris Singer owed approximately $3,100 to Arthur Ashkenase. On the afternoon of November 7, 1966, Ashkenase appeared at Singer's clothing store with Salvatore Rispo. They informed Singer that Rispo now owned the debt (which had suddenly become $10,000) and told him to make a telephone call. He was told that a girl would probably answer "the Teamsters" and that he should ask for the "big man." Singer made the call and a man answered who described himself as "the boss." The caller had a short discussion with Singer telling him that he had better get the $10,000 quickly.

The next day, November 8, Singer received another telephone call from the same person with whom he had spoken on the telephone the previous day. The caller made several statements to the effect that Singer had better pay or he would be killed, and then told Singer that he would accept an installment payment of $4,500 by the end of the week. On the evening of November 10, Singer received another telephone call from the same person, who again described himself as "the boss." Again, a short conversation occurred in which the caller demanded money and Singer begged for more time. A short time later the same evening, the same person called again and told Singer that a meeting would be arranged the following morning.

The next morning, November 11, Singer received another telephone call from the same person. Singer was directed to go to Lerner's Restaurant at 2nd and Market Streets in Philadelphia, where he would see someone he knew; and was told to sit at that person's table. Singer went to the restaurant with several detectives from the Philadelphia District Attorney's office. There he saw Rispo and sat with him. On a prearranged signal from Singer, the police arrested Rispo. Relator was also arrested, as he was present in the restaurant and had been talking to Rispo just before Singer arrived.

Relator was taken directly to City Hall and placed in a section of Room 708A, which was separated from the detectives' offices by a partition which did not extend all the way to the ceiling. Sgt. McLellan, one of the detectives who participated in the arrest, brought Mr.

Singer to the detectives' office. He testified at trial that they arrived after relator, and that Singer remained on the other side of the partition from relator.[1] A detective Roman, who was not involved in the arrest, testified at the hearing before this Court that he was the only person in Room 708A when relator was brought in, and that Singer was brought in later. Relator testified that Singer was in Room 708A when he arrived and that he was led past Singer. He also testified that he was taken to Room 708A "as fast as the red car could get from Second and Market to the District Attorney's office." N.T. 15. Detective Lynch, who participated in the arrest, testified that he rode to City Hall with McLellan and Singer in a separate car, and was in Room 708A when relator arrived. Despite the conflict as to who arrived at Room 708A first, there is no evidence, other than relator's statement that he was led past Singer, that Singer saw anyone taken behind the partition or knew in any way who was there.

The record shows that Singer was brought to Room 708A for the purpose of identifying a voice, and that he was aware of this purpose.

Detective Lynch met relator in Room 708A, told him that he had a right to remain silent, and proceeded to fill out an arrest report. General conversation ensued between relator and several detectives, some of which related to trucking and strikes. The detectives did not discuss with relator anything relating to the charges later brought against him. The record is not clear as to how many detectives engaged in conversation with relator at any one time, but it appears that a total of about four spoke with him at various times. However, relator was the main speaker.

Approximately 15 to 20 minutes after Singer arrived, he recognized one of the voices on the other side of the partition as that of the person known as "the boss," who had been calling him. Detective McLellan testified that he knew that the voice Singer was referring to was that of relator, and that he went to the other side of the partition and brought relator out to the office where Singer was sitting. Relator then spoke and Singer again identified his voice as the one heard over the telephone. At trial, Singer pointed out relator as the man he had identified on November 11 and the man who had made threatening telephone calls to him.

In this case, it is obvious that the pre-trial voice identification was a significant factor in the identification at trial, and was a crucial element in the conviction. See Gilbert v. California, *supra*, 388 U.S. at 272, 87 S.Ct. 1951.

An identification is constitutionally defective if the confrontation "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [relator] was denied due process of law." Stovall v. Denno, *supra*, 388 U.S. at 302, 87 S.Ct. at 1972; Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). In Simmons v. United States, *supra*, the Court outlined the factors which must be assessed in passing on identification. They are, essentially, the ability of the witness to discern the person's features at the time of the crime, the degree to which the identification process emphasizes one individual, and the degree to which the prosecuting authorities indicate to the witness that they have other evidence that a person displayed has committed the crime. Stovall v. Denno, *supra*, emphasizes that necessity may justify the use of a particular form of identification as against a less suggestive procedure.

In Foster v. California, 394 U.S. 440, 89 S.Ct. 1217, 22 L.Ed.2d 402 (1969), the Court found an identification procedure to be unduly suggestive when the

---

1. Sgt. McLellan, the detective most intimately involved in the identification, had died by the time of the hearing in this Court. However, his testimony at trial in the state court is in the record.

defendant was first displayed in a lineup in which he was approximately one foot taller than the other two participants, next displayed to the witness alone at which time the witness spoke with him, and then displayed in another lineup in which he was the only person who had participated in the first lineup. In Palmer v. Peyton, 359 F.2d 199 (4 Cir. 1966), the court found a voice identification to be unduly suggestive when the police told the witness that they had a suspect whose voice they wanted her to listen to. The defendant was required to repeat the words spoken to the witness at the time of the crime, his was the only voice the witness heard during the identification procedure, the witness was shown a shirt taken from the defendant which resembled one worn by the person who committed the crime, and, though the witness had seen the person who had attacked her, the defendant was not displayed to her in any way other than through speaking. In Biggers v. Tennessee, 390 U.S. 404, 88 S.Ct. 979, 19 L. Ed.2d 1267 (1968), the judgment upholding an identification was affirmed by an equally divided Court, Mr. Justice Douglas dissenting. The identification occurred some six months after the crime, the police told the witness that she was being taken to the station to "look at a suspect," the defendant was displayed to the witness alone, and he was required to state the words that the witness's assailant had uttered at the time of the crime.

 The procedures used in the present case are less suggestive than those involved in the above cases. Singer, at the time he made the identification, had heard relator's voice five times over the telephone during the five preceding days. Singer was not told who was behind the partition. There were several voices from which to choose. Although the overheard conversation involved truckers, the only significance to Singer of this circumstance related to the single instance five days before when Rispo had told him that the an-

swer at the number he would call would be "the Teamsters." (The person who answered did not in fact answer in those words.) Though Singer knew that he was to identify someone and that certain people had just been arrested, he did not know that any specific person behind the partition was a suspect or had been arrested. The fact that Sgt. McLellan brought relator to the office for a face-to-face confrontation does not vitiate the identification which had already occurred. The record shows that McLellan knew to whom Singer was referring when he indicated that he recognized the voice, and displayed relator to Singer merely for the purpose of enabling him to know whom he had identified. Finally, it should be noted that voice identification was the only possible means of identifying the caller in this case.

I have concluded that the identification procedures in this case did not violate due process.