329 A.2d 513
**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Fred D. GULLETT, Appellee.**

Supreme Court of Pennsylvania.

Argued Nov. 16, 1973.

Decided Dec. 10, 1974.

434

Arlen Specter, Dist. Atty., Richard A. Sprague, 1st Asst. Dist. Atty., Milton M. Stein, Asst. Dist. Atty., Chief, Appeals Div., Arthur R. Makadon, Steven H. Goldblatt, Albert L. Becker, Asst. Dist. Attys., E. Rendell, Philadelphia, for appellant.

Bruce W. Miller, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

NIX, Justice.

Appellee, Fred Gullett, was arrested and indicted on the charges of murder, sodomy and rape upon the person of his next door neighbor, Mrs. Elizabeth Sciorilli. A hearing was held upon a petition for suppression filed on appellee's behalf and an order was entered suppressing physical evidence obtained pursuant to two search warrants and all statements, oral and written, made by the appellee to police authorities. The Commonwealth now appeals from a portion of this order.[1]

---

1. Jurisdiction for the appeal under the murder indictment is pursuant to Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202(1);

■ It is settled law within this jurisdiction that the Commonwealth may appeal from an adverse ruling below where it appears either that the order of suppression will necessitate the termination and conclusion of the prosecution or that the adverse order will substantially impair the prosecution in the presentation of its case. *Commonwealth v. Bosurgi,* 411 Pa. 56, 190 A.2d 304, cert. denied, 375 U.S. 910, 84 S.Ct. 204, 11 L.Ed.2d 149 (1963). See also, *Commonwealth v. Washington,* 428 Pa. 131, 236 A. 2d 772 (1968); *Commonwealth v. Fisher,* 422 Pa. 134, 221 A.2d 115 (1966); *Commonwealth v. Warfield,* 418 Pa. 301, 211 A.2d 452 (1965); American Bar Association Project on Standards for Criminal Justice, Standards Relating to Criminal Appeals § 1.4(a)(iii) (Approved Draft, 1970).

In this appeal the Commonwealth does not challenge the order suppressing appellee's in custody admissions but rather confines their objections to the order of the court below suppressing the physical evidence seized during the search. Both sides are in agreement that the sole issue presented is whether there was probable cause to justify the issuance of the search warrants.

■ It is admitted that a portion of the information contained within the affidavits is within the purview of that part of the suppression order which is not contested. The inclusion of evidence subsequently determined to be inadmissible will not invalidate a search warrant if the warrant is also based upon other competent sources and is sufficient to constitute probable cause. In *Commonwealth v. Thomas,* 444 Pa. 436, 447, 282 A.2d 693, 699–700 (1971) we stated:

" '[T]he law is quite clear that the inclusion of illegally obtained evidence does not vitiate a search warrant

17 P.S. § 211.202(1) (Supp.1974–75). Jurisdiction for the appeals under the nonfelonious indictments arise under Act of July 31, 1970, P.L. 673, No. 223, art. V, § 503(a); 17 P.S. § 211.503(a) (Supp.1974–75).

which is otherwise validly issued upon probable cause reflected in the affidavit and based on proper sources. *Clay v. United States*, 246 F.2d 298 (5th Cir. 1957), cert. denied, 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed. 269; *Chin Kay v. United States*, 311 F.2d 317 (9th Cir. 1963)': *United States v. Sterling*, 369 F.2d 799, 802 (3d Cir. 1966). Accord, *James v. United States*, 135 U.S.App.D.C. 314, 418 F.2d 1150 (1969)."

 Excising from the affidavits supporting the warrants that information found to be within the ambit of that portion of the suppression order which is not contested, we are satisfied that there nevertheless exists sufficient facts independently obtained which supplies probable cause for the warrants' issuance. The affidavits establish that the police were aware of witnesses who could identify the voice of the appellee as being the anonymous caller who first advised police officials that there was a body in the premises where the deceased was discovered lying on the kitchen floor after having been strangled and sexually assaulted. The caller also stated that there would be more bodies when they (the police) arrived. Upon arriving at the scene, the police found the property to be secure and there was no sign of forceable entry. Thus, it could be concluded that the intruder was admitted by the deceased who was the only occupant of the residence present at the time in question. The police learned that the appellee, a next door neighbor, had been in the home in the past for the purpose of doing plumbing repairs. They were also advised of the deceased's reluctance to admit persons when she was home alone, giving rise to the inference that the person admitted was known to her and accustomed to being in the dwelling.

Before entering the premises by forcing open the rear shed door the police officer peered through the shed window and observed an arm of an individual lying on the kitchen floor. When the officer related this information to appellee, who had accompanied the officer to the rear

of the house,[2] Gullett, although he had not looked in the window stated: "Momma Momma, they didn't have to do this." It was also known that the appellee called the deceased "Momma" and that other individuals resided within the premises, including one other adult female. The police also ascertained that Gullett had previously been arrested for sex crimes including buggery and rape. The medical examiner reported that the victim had apparently been sexually molested by buggery. Finally, it had been determined from an interview with appellant's wife that he was not home at the time this incident was determined to have occurred.

> "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." *Commonwealth v. Thomas*, 448 Pa. 42, 52, 292 A.2d 352, 357 (1972).

From the foregoing facts the Issuing Authority was made aware that the victim had been murdered and sodomized by buggery; that the killing had been probably perpetrated by someone known to the victim and who had been admitted with the permission of the victim; that the appellee was the first to have known of the death; that Gullett was aware of the identity of the body before he was supposed to have had an opportunity to make such an identification; that he was the unidentified caller who notified the police; that he was absent from his home at the time of the incident; that he was known to the victim and would probably have been admitted by her; and that there was reason to believe that he had previously engaged in the type of sexually errant

---

**2.** When the police arrived and were unable to gain admittance through the front entrance of the premises they went to the home of the appellee, who permitted them to go through his home to the rear of the dwelling in question. There was no fence separating the two rear yards.

behavior herein involved. This information clearly supplied to the Issuing Authority the probability of culpability on the part of appellee that would justify the warrant's issuance. *Commonwealth v. Marino*, 435 Pa. 245, 253, 255 A.2d 911 (1972).

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' or probable cause 'is a reasonable ground for belief of guilt.' *McCarthy v. De Armit*, 99 Pa. 63, 69, quoted with approval in the *Carroll* opinion. 267 U.S. at 161, 45 S.Ct. 280. And this 'means less than evidence which would justify condemnation' or conviction, as Marshall, C. J., said for the Court more than a century ago in *Locke v. United States*, 7 Cranch 339, 348, 3 L.Ed. 364. Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543.

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mis-

takes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

(Footnotes omitted).

*Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S. Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949).

The appellee further argues that the fact of his past criminal record could not properly be considered for this purpose. We do not agree. The reasons for our determination to exclude defendant's prior criminal conduct as substantive evidence of guilt at trial are not operative at this stage of the proceeding and need not require a similar result here. In discussing the rationale for our evidentiary rule excluding testimony of past crimes as proof of guilt we recently stated:

"As this Court has recently stated: 'It is a fundamental precept of the common law that the prosecution may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt of the present charge. It has been succinctly stated that "[t]he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he is being tried. The presumed effect of such evidence is to predispose the minds of the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence." ' *Commonwealth v. Allen,* 448 Pa. 177,

181–182, 292 A.2d 373, 375 (1972) (footnote omitted) (quoting *Commonwealth v. Trowery*, 211 Pa.Super. 171, 173–174, 235 A.2d 171, 172 (1967)). In *Allen,* we stated that the constant reference to police photographs of the accused permitted the jury to infer that the appellant had a prior criminal record." *Commonwealth v. Clark*, 453 Pa. 449, 452, 309 A.2d 589, 590 (1973).[3]

The reason for the rejection of this evidence is not because it fails to have any probative value on the probability of the accused's guilt but rather that the presumed effect is to predispose the minds of the jury to an extent that it would unduly overshadow the presumption of innocence. Here the presumption of innocence is not operative; the only issue is whether the investigating authorities had a reasonable basis for determining the probability of this accused's guilt. In *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 2081, 29 L.Ed. 2d 723 (1971) Mr. Chief Justice Burger observed:

> "We cannot conclude that a policeman's knowledge of a suspect's reputation—something that policemen frequently know and a factor that impressed such a 'legal technician' as Mr. Justice Frankfurter—is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely . . . ."[4]

3. "For a variety of reasons relating not only to probative value and trustworthiness, but also to possible prejudicial effect upon a trial jury and the absence of opportunity for cross-examination, the generally accepted rules of evidence throw many exclusionary protections about one who is charged with and standing trial for crime. Much evidence of real and substantial probative value goes out on considerations irrelevant to its probative weight but relevant to possible misunderstanding or misuse by the jury." *Brinegar v. United States,* supra, 338 U.S. at 173, 69 S.Ct. at 1309.

4. Unlike the issue presented in *Harris,* supra, we need not here consider whether this information may be relied upon in assessing the reliability of an informant's tip. *Cf. Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The

■ It cannot be argued with serious conviction that the fact of appellee's prior history for a rather unique type of sexual deviancy, of the very type involved in the crime, does not meet the "more likely than not" relevancy test on the question of the probability of his implication. While, clearly his past criminal history alone would not justify a finding of probable cause regardless how similar the circumstances, it clearly can be considered as one of the factors leading to that determination.

■ Nor, do we suggest that evidence of every past arrest or conviction is necessarily relevant in an inquiry of probable cause. To so conclude would be a determination that the malevolence involved in the commission of any crime, no matter how unrelated, has probative value upon the accused's connection to the crime in question. The absurdity of such a proposition is evident. Our conclusion here merely expresses the view that where the past criminal conduct bears a sufficient similarity either because of the nature of the crime or the manner of its execution to the act in question, so as to give rise to a reasonable inference that the same person committed both acts, this fact can be considered along with the other available information in a determination of probable cause.

■ Lastly, appellee argues that the voice identification from the tape recording made by the police without the consent of the caller was a violation of the Pennsylvania anti-wiretapping statute, Act of July 16, 1957, P.L. 956, No. 411, § 1, 18 P.S. § 3742 (Supp.1972–73) [5] and

instant discussion focuses upon the quantum of knowledge required to be possessed by police officials to satisfy the requirements of probable cause; more particularly, whether the knowledge of a prior arrest can be assessed as a part of that information.

5. This act was repealed and substantially reenacted by the Act of December 6, 1972, P.L. 1482, No. 334, §§ 1–4, 18 C.P.S.A. §§ 5701–5704 (1973).

thus *inadmissible as evidence in support of a finding of probable cause.*

The Act provides, in part, that:

"No person shall intercept a communication by telephone . . . without permission of the parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone . . . with intent to intercept a communication in violation of this act. No person shall divulge or use the contents or purport of a communication intercepted in violation of this act. . . . The term 'divulge' includes divulgence to a fellow employe or official in government or private enterprise or in a judicial, administrative, legislative or other proceeding. Except as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding. . . ."

The statute is designed to secure the integrity of this particular means of private communication. This Court has interpreted the Act as mandating that no person shall without the consent of all parties to the conversation surreptitiously intercept or record the communication. Nor shall any evidence obtained from the aforesaid prohibited intrusion be admissible in any judicial proceeding. As was observed in *Commonwealth v. McCoy (Papszycki)*, 442 Pa. 234, 275 A.2d 28 (1971),

"Unlike the majority of other jurisdictions, which either have no anti-wiretapping statute or ones similar to the federal statutes which require only the consent of one of the parties, Pennsylvania's anti-wiretapping statute clearly demands that the consent of all parties be given before any device for overhearing or recording is installed or utilized. The statute contains no exceptions even for interceptions by governmental authorities engaged in an attempt to apprehend a criminal. Hence the Legislature has determined as a mat-

ter of state public policy that the right of any caller to the privacy of his conversation is of greater societal value than the interest served by permitting eavesdropping or wiretapping. Such a determination, when within constitutional limits, is solely within the discretion of the Legislature."

*Id.* at 238–239, 275 A.2d at 30–31 (footnotes omitted) ; see also, *Commonwealth v. Murray*, 423 Pa. 37, 223 A.2d 102 (1966).

It is the consent of all the parties to the questioned communication that is determinative and in the instant appeal we must determine whether the appellee supplied that consent which would legalize what would otherwise be a prohibited intrusion. The gist of the call to the police put them on notice as to the occurrence of a homicide, the location of where the body would be found and the possibility that this would be but one in a series of killings. From the nature of the call, the non-confidential quality of the information conveyed, the emergency atmosphere the communication engendered, and the particular agency to which the disclosure was directed, it is apparent that the caller did not intend the privacy of the communication to be maintained. Rather, the conclusion is inescapable that a call made under these circumstances carried with it the permission of the caller to divulge the communication to authorized police personnel other than the officer who happened to take the message and to use the communication to investigate the reported crime by any reasonable means. We thus hold that on these facts there was no violation of the Act of 1957.

Accordingly, the order of the court below, suppressing the physical evidence obtained pursuant to the search warrants, is reversed. The cause is remanded, for proceedings consistent herewith.

ROBERTS, J., filed a dissenting opinion in which MANDERINO, J., joined.

ROBERTS, Justice (dissenting).

Today, the majority decrees that the price every man, woman and child must pay to call the police department is the surrender of the caller's right to telephonic privacy guaranteed by the Pennsylvania Anti-Wire Tap Act.[1] The majority declares that by merely dialing the police department's telephone number, the caller consents to have his conversation intercepted, recorded and replayed to others at the sole discretion of the police. That declaration plainly disregards the express words of the statute and is tantamount to judicial repeal of the Act's guarantee of privacy.

The Pennsylvania Anti-Wire Tap Act was created to stem the fears articulated by Justice Brandeis almost 50 years ago: "As a means of espionage, writs of assistance

---

1. "No person shall intercept a communication by telephone or telegraph without permission of the parties to such communication. No person shall install or employ any device for overhearing or recording communications passing through a telephone or telegraph line with intent to intercept a communication in violation of this act. No person shall divulge or use the contents or purport of a communication intercepted in violation of this act. Whoever wilfully violates or aids, abets or procures a violation of this act is guilty of a misdemeanor, and shall be punishable by imprisonment of not more than one year, or by fine of not more than five thousand dollars ($5000), or both, and shall be liable to any person whose communication is unlawfully intercepted or divulged for treble the amount of any damage resulting from such unlawful interception, divulgence or use, but in no event less than one hundred dollars ($100) and a reasonable attorney's fee. The term 'person' includes natural persons, business associations, partnerships, corporations, or other legal entities, and persons acting or purporting to act for, or in behalf of, any government or subdivision thereof, whether Federal, State or local. The term 'divulge' includes divulgence to a fellow employe or official in government or private enterprise or in a judicial, administrative, legislative or other proceeding. Except as proof in a suit or prosecution for a violation of this act, no evidence obtained as a result of an unlawful interception shall be admissible in any such proceeding. Nothing in this act shall be interpreted to apply to acts done by personnel of any telephone or telegraph carrier in the performance of their duties in connection with the construction, maintenance or operation of a telephone or telegraph system."
Act of July 16, 1957, P.L. 956, § 1, 18 P.S. § 3742 (Supp.1973).

and general warrants are but puny instruments of tyranny and oppression when compared with wire-tapping." *Olmstead v. United States*, 277 U.S. 438, 476, 48 S.Ct. 564, 571, 72 L.Ed. 944 (1928).

More recently, the Task Force on Organized Crime noted: "In a democratic society, privacy of communications is essential if citizens are to think and act constructively." President's Committee on Law Enforcement and the Administration of Justice, Task Force Report on Organized Crime ( ).

The Act's provisions are explicit and direct. Any person intercepting a call without the consent of *both* parties to the conversation commits a misdemeanor. Any person divulging the content of the call also commits a misdemeanor. "[N]o evidence obtained as a result of an unlawful interception shall be admissable in any [judicial] proceeding." No words could express a prohibition more emphatically and straightforwardly.

Here, the police department's interception, recording and disclosure of appellee's telephone conversation without his permission clearly violated his statutorily guaranteed right of privacy. *Commonwealth v. Papszycki*, 442 Pa. 234, 275 A.2d 28. (1971). *Commonwealth v. Murray*, 423 Pa. 37, 223 A.2d 102 (1966). The police played the taped telephone call to the victim's daughter and grandchildren who identified Gullett's voice. The contents of the telephone conversation were used against the caller; they were "evidence obtained as a result of an unlawful interception." Despite the Act's unambiguous mandate forbidding the use of such evidence in judicial proceedings, the magistrate considered the telephone voice identification in determining probable cause. Clearly that use is prohibited and the majority's refusal to so hold defies both the Act's prohibition and the caller's privacy.

The majority attempts to justify defiance of the Act by imposing a coerced consent upon the caller. This

technique is legally, logically and realistically threadbare. Valid consent requires an " 'essentially free and unconstrained choice by its maker.' " *Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Surely by calling the police or any other government agency one does not freely choose to consent to the interception of his conversation. The majority by imposing a waiver of statutory rights as a condition to access to the police, employs a fiction stripping the caller of the Act's protection.

The majority's imposed consent approach creates an exception to the statute's prohibitions specifically denied the police and all other governmental agencies by the very language of the Act. The Anti-Wire Tap Act explicitly directs that its prohibitions extend to "persons acting or purporting to act for, or in behalf of, any government or subdivision thereof, whether Federal, State or local." In *Commonwealth v. Papszycki,* 442 Pa. 234, 275 A.2d 28 (1966), this court unanimously declared:

> "Pennsylvania's anti-wire tapping statute clearly demands that the consent of *all* parties be given before any device for overhearing or recording is installed or utilized. The statute contains no exceptions even for interceptions by governmental authorities engaged in an attempt to apprehend a criminal."

Id. at 239, 275 A.2d at 30 (footnote omitted).

The majority's unusual conception of consent here employed not only distorts the clear words of the Act but also destroys the very essence of the statutory guarantee just as completely as if the Legislature had itself repealed the Act. Its interpretation defies the legislative will and is wholly unmindful of this Court's conclusion in *Papszycki,* supra, that:

> "the Legislature had determined as a matter of state public policy that the right of any caller to the privacy of his conversations is of greater societal value than

the interest served by permitting eavesdropping or wiretapping. Such a determination, when within constitutional limits, is solely within the discretion of the Legislature."

Id. at 239, 275 A.2d at 30–31. Despite the definite command of the statute and this Court's decision in *Papszycki,* the majority utterly disregards the balance struck by the Legislature and intrudes into an area "[s]olely within the discretion of the Legislature."

In 1957, the Legislature created in the Anti-Wire Tap Act a bastion of telephonic privacy. In 1971, this Court in *Papszycki* unanimously enforced the Act's guarantees. Today the majority departs from our case and statutory law and arbitrarily terminates the Act's guarantees of telephone privacy. This enormous invasion of guaranteed privacy of telephonic communications compels dissent.

Furthermore, in my view, an issuing magistrate may not consider a suspect's arrest record. Our Superior Court has consistently reached the same conclusion. *Commonwealth v. Davis,* 225 Pa.Super. 242, 245, 310 A. 2d 334, 336 (1973); *Commonwealth v. Suppa,* 223 Pa.Super. 513, 516, 302 A.2d 357, 358–359 (1973); *Commonwealth v. Dial,* 218 Pa.Super. 248, 255, 276 A.2d 314, 318, aff'd in part and rev'd in part, 445 Pa. 251, 285 A.2d 125 (1971).

A police affirmation that the suspect has been arrested in the past is little more than a claim that the accused is believed by the police to have been involved in criminal activity. See *Spinelli v. United States,* 393 U.S. 410, 414, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969). An arrest record reveals nothing of the probability that the suspect committed the particular crime under investigation. More fundamentally, without a conviction it does not even show that he committed the other crime. In *Spinelli,* the Supreme Court of the United States refused to

permit such a bald assertion to support a warrant. 393 U.S. at 414, 89 S.Ct. at 588. Here the facts dictate the same result.

Properly analyzed, an arrest record is nothing more than a hearsay declaration that an unnamed police officer at some time in the past suspected the accused of another crime. True, magistrates may consider hearsay in proceedings for a warrant. However, the Constitution requires that probable cause "be determined by a 'neutral and detached magistrate,' and not by 'the officer engaged in the often competitive enterprise of ferreting out crime.' " *Spinelli,* supra, at 415, 89 S.Ct. at 588–589.

Thus we require that the affiant inform the magistrate of some of the underlying circumstances upon which the informant bases his conclusion and the reasons why the affiant believes the informant to be reliable. *Commonwealth v. Conner,* 452 Pa. 333, 337, 305 A.2d 341, 343 (1973). See *Spinelli,* supra, U.S. at 413, 89 S.Ct. at 587; *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).[2]

In this case, the police submitted none of this information. The magistrate was thus unable to establish independently that probable cause existed. Absent such information, it cannot be said that probable cause was determined by a neutral and detached magistrate as required by the Constitution. *Spinelli,* supra, at 415, 89 S. Ct. 588–589.

Even if it were assumed that an arrest record may be considered in establishing probable cause, it would at least require that the magistrate be informed when the arrest occurred. Certainly an arrest years prior to the

2. The views of the Chief Justice in *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 2081, 29 L.Ed.2d 723 (1971), provide no authority for the majority's position. First, this is not a case where the reputation of the suspect was personally known to the affiant. Second, the relevant part of the Chief Justice's opinion announcing the result in *Harris* was joined by only two other justices. Four justices dissented.

warrant request has no probative weight. The affiant here failed to disclose whether the arrest had taken place twenty years, twenty months or twenty days before the offense. Therefore, it could not form the basis for the issuance of a warrant. *Commonwealth v. Eazer*, 455 Pa. 320, 312 A.2d 398 (1973).[3] See *Commonwealth v. Manduchi*, 222 Pa.Super. 562, 453 Pa. 488, 493–494, 309 A.2d 358, 361–562, 295 A.2d 150 (1972); see also *Secretary of Revenue v. John's Vending Corp.*, 362 (1973);[4] *McIntosh v. Pittsburgh Rys.*, 432 Pa. 123, 247 A.2d 467 (1968).

The only factual assertions tending to establish probable cause were that appellee knew the deceased, that he was absent from his home at the time of the crime, and that he exclaimed the victim's name when told of the murder. All this is constitutionally insufficient to show

3. In *Eazer*, police officers relied on evidence of criminal conduct gathered 61 days prior to their warrant request to show probable cause. We held that probable cause had not been established. "[A] two-month-old criminal act is too remote in time and certainty to provide the requisite existing probable cause necessary for the issuance of a search warrant."
455 Pa. at 325, 312 A.2d at 400.

4. In *John's Vending Corp.*, Mr Justice Nix speaking for the Court said:
"[T]he fact that these crimes occurred almost twenty years ago renders them of little value in predicting future conduct of their perpetrator. Cf. *McIntosh v. Pittsburgh Railways Company*, 432 Pa. 123, 247 A.2d 467 (1968). A provision of the nature of Section 403(2) at best only suggests that a person who has committed certain acts in the past would be more likely to betray the trust that this license entails than a citizen with no such past history. Such reasoning, while not infallible, has a logical basis in experience. But that basis exists only where those events occurred so recently that the particular character trait of the individual involved can reasonably be assumed to have remained unchanged. Where, as here, nearly twenty years has expired since the convictions and the record reveals that the individual has held this position of responsibility for twelve years without any allegation of impropriety, it is ludicrous to contend that those prior acts provide any basis to evaluate his present character."
*Secretary of Revenue v. John's Vending Corp.*, 453 Pa. at 493–494, 309 A.2d at 361–362.

probable cause for the issuance of a search warrant. I dissent and would affirm the suppression court.

MANDERINO, J., joins in this dissent.