PEOPLE v PERLOS

PEOPLE v BROWN

PEOPLE v MILLER

PEOPLE v BENTLEY

PEOPLE v SCHOMER

PEOPLE v ENGLAND

Docket Nos. 86432-86436, 86524. Argued May 10, 1990 (Calendar Nos. 2-3). Decided September 25, 1990.

Charles A. Perlos, Robert L. Brown, Marcy B. Miller, Timothy F. Bentley, and John B. Schomer were separately charged in the 12th District Court with driving while under the influence of intoxicating liquor or a controlled substance. The defendants separately moved to suppress the admission of blood alcohol test results, MCL 257.625a(9); MSA 9.2325(1)(9), which were obtained without their permission after each had been involved in separate automobile accidents. In *Perlos* and *Miller,* the court, Lysle G. Hall, J., denied the motions, finding that MCL 257.625a(9); MSA 9.2325(1)(9) was constitutional. In *Bentley,* the court, James M. Justin, J., granted the motion, ruling that the statute was unconstitutional. In *Brown,* the court, Robert Crary, Jr., J., denied the motion as did the court, Robert E. Biewend, J., in *Schomer.* On appeal, the cases were consolidated in the Jackson Circuit Court, Gordon W. Britten, J., which found MCL 257.625a(9); MSA 9.2325(1)(9) to be unconstitutional and suppressed the evidence. The Court of Appeals, MICHAEL J. KELLY, P.J., and J. D. PAYANT, J. (McDONALD, J., concurring in the result only), affirmed, finding sufficient governmental involvement in the taking of the blood in these cases to invoke Fourth Amendment protections, and determining that the searches did not fall within any of the exceptions to the search warrant requirement and that federal and state equal protection guarantees had been violated (Docket Nos. 99852-99856). Thereafter, the Court of Appeals remanded the

REFERENCES

Am Jur 2d, Searches and Seizures §§ 29, 105.

See the Index to Annotations under Blood Tests.

cases to the district court to determine whether an independent source existed to permit admission of the evidence (Docket Nos. 99852-99856). The people appeal.

Trevor C. England was convicted following a bench trial in the Oakland Circuit Court, Frederick C. Ziem, J., of two counts of involuntary manslaughter. Prior to trial, the court denied the defendant's motion to suppress blood test results which were taken without a search warrant and without his consent following an automobile accident which caused the two deaths. The Court of Appeals, MacKenzie, P.J., and Weaver and E. A. Quinnell, JJ., affirmed in an opinion per curiam, explicitly declining to adopt the analysis of *Perlos* (Docket No. 99838). The defendant appeals.

In an opinion by Chief Justice Riley, joined by Justices Brickley, Boyle, and Griffin, the Supreme Court *held:*

The provision in the implied consent act, MCL 257.625a(9); MSA 9.2325(1)(9), for the admission in a prosecution involving driving under the influence of intoxicating liquor or a controlled substance of the results of a chemical analysis of a blood sample drawn for the purpose of medical treatment from a driver of a vehicle involved in an accident, and the requirement in the act that the medical facility or person performing the analysis must release the results to a prosecuting attorney who requests the results for use in the prosecution are constitutionally valid under US Const, Am IV and Const 1963, art 1, § 11, and the Equal Protection Clauses of US Const, Am XIV and Const 1963, art 1, § 2.

1. MCL 257.625a(9); MSA 9.2325(1)(9) provides that if after an accident the driver of a vehicle involved in the accident is transported to a medical facility and a sample of the driver's blood is withdrawn at that time for the purpose of medical treatment, the results of a chemical analysis of that sample are admissible in a criminal prosecution for a crime to show the amount of alcohol or presence of a controlled substance in the person's blood at the time of the accident, regardless of whether the person had been offered or had refused a chemical test. The medical facility or person performing the chemical analysis must disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution.

2. Under the circumstances of these cases, the defendants did not have a protected Fourth Amendment interest in the blood alcohol test results. The removal of the blood samples from these defendants was done for purposes of medical treatment and not at the direction of state agents. The actual removal of

the blood samples was not a search protected by the Fourth Amendment because state action was not involved. Although the defendants shared a subjective expectation that the test results would remain private, it is not an expectation that under the circumstances society is willing to consider reasonable. Given the societal concerns with regard to drunken driving, the Legislature's implied amendment of the physician-patient privilege, and the resulting minimal intrusion upon these defendants, any expectation of privacy the defendants may have had in the test results was unjustified. The defendants, in conveying information to the hospitals, assumed the risk that the hospitals might disclose information to the state. Thus, MCL 257.625a(9); MSA 9.2325(1)(9) does not violate US Const, Am IV or Const 1963, art 1, § 11.

3. Nor does it violate the Equal Protection Clauses of the Michigan and United States Constitutions. Hospitalized persons, not under arrest, do not constitute a suspect class. Moreover, the classification itself is rationally related to the legitimate state interests of easing the prosecution of drunken drivers and ensuring safer travel.

*Perlos, Brown, Miller, Bentley,* and *Schomer,* reversed and remanded to the district court.

*England,* affirmed.

Justice LEVIN, joined by Justices CAVANAGH and ARCHER, dissenting, stated that MCL 257.625a(9); MSA 9.2325(1)(9), which requires a medical facility or a person who performs a chemical analysis of a blood sample withdrawn for the purpose of medical treatment at the facility from the driver of a motor vehicle involved in an accident to disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution, is unconstitutional. Society would view the defendants' subjective expectation that their test results would remain private as reasonable; therefore, absent exigent circumstances, a person's medical records should not be obtained without a warrant.

177 Mich App 657; 442 NW2d 734 (1989) reversed.

176 Mich App 334; 438 NW2d 908 (1989) affirmed.

SEARCHES AND SEIZURES — BLOOD TESTS — DRIVING WHILE INTOXICATED.

The provision in the implied consent act for the admission in a prosecution involving driving under the influence of intoxicating liquor or a controlled substance of the results of a chemical analysis of a blood sample drawn for the purpose of medical treatment from a driver of a vehicle involved in an accident,

and the requirement in the act that the medical facility or person performing the analysis must release the results to a prosecuting attorney who requests the results for use in the prosecution are constitutionally valid (US Const, Ams IV, XIV; Const 1963, art 1, §§ 2, 11; MCL 257.625a[9]; MSA 9.2325[1][9]).

*Frank J. Kelley,* Attorney General, *Joseph S. Filip,* Prosecuting Attorney, and *Jerrold Schrotenboer,* Chief Appellate Attorney, for the people in *Perlos.*

*Frank J. Kelley,* Attorney General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Paul J. Fischer,* Assistant Prosecuting Attorney, for the people in *England.*

*Jerome A. Susskind* for defendants Perlos, Bentley, and Schomer.

*Robison & Sims, P.C.* (by *John M. Sims*), for defendant Brown.

*John P. Kobrin, Jr.,* for defendant Miller.

*John D. Lazar* for defendant England.

Amicus Curiae:

*John D. O'Hair,* President, *William A. Forsyth,* Prosecuting Attorney, and *Timothy K. McMorrow,* Chief Appellate Attorney, for the Prosecuting Attorneys' Association of Michigan.

RILEY, C.J. We granted leave to appeal and consolidated these six cases to determine whether MCL 257.625a(9); MSA 9.2325(1)(9) is constitutional, and whether disputed blood test results should be suppressed. Additionally, in *People v Perlos (On Rehearing),* 177 Mich App 657, 658; 442

NW2d 734 (1989), we granted leave to appeal to consider whether the Court of Appeals correctly remanded the case to allow plaintiff to present evidence on a possible "independent source" for the disputed test results. We hold that MCL 257.625a(9); MSA 9.2325(1)(9) is constitutional under US Const, Am IV and Const 1963, art 1, § 11, and the Equal Protection Clauses of US Const, Am XIV and Const 1963, art 1, § 2. Accordingly, we reverse the decision of the Court of Appeals in *People v Perlos,* and affirm the decision of the Court of Appeals in *People v England.*[1]

I

### A. *PEOPLE v PERLOS, BROWN, MILLER, BENTLEY, SCHOMER*

In each of these five cases defendants were involved in one-car accidents in Jackson County between December, 1984, and November, 1985. All defendants were taken to Foote Hospital in Jackson, except for defendant Brown who was transported to Albion Community Hospital. At the hospitals, defendants were subjected to blood tests to measure the alcohol content in their blood. These tests were made for medical treatment.[2] The re-

---

[1] We find it unnecessary to reach the issues whether the test results in both cases should be suppressed, and whether the Court of Appeals in *Perlos* properly remanded to the trial court.

[2] The record indicates that the cases of defendants Perlos, Bentley, and Miller were initially consolidated in circuit court with two defendants not involved in this appeal. Those five stipulated for purposes of appeal that their blood was drawn for medical treatment. The record lacks any stipulation by defendants Brown or Schomer to that effect. Nonetheless, the five cases before us were consolidated to decide the same issue—the constitutionality of MCL 257.625a(9); MSA 9.2325(1)(9). The only way the constitutionality of the statute can be properly before this Court is if the cases meet the requirements of the statute.

Defendant Brown contests that his blood test was for purposes of medical treatment. Since *Perlos* is an interlocutory appeal, defen-

sults of the tests showed that all defendants had an alcohol content over the 0.10 percent limit, signifying legal intoxication.

Some time after the tests were performed, and pursuant to MCL 257.625a(9); MSA 9.2325(1)(9),[3] the prosecution requested the test results from the hospitals, and the hospitals complied. The prosecution did not obtain a search warrant in order to get the results, nor did defendants consent to the release of the records. On the basis of the results of the tests, defendants were arrested and charged with operating a motor vehicle while under the influence of intoxicating liquor, MCL 257.625; MSA 9.2325.

In district court, defendants moved to suppress their test results, claiming that subsection 9 of the implied consent act[4] was unconstitutional. In *Perlos, Miller, Brown,* and *Schomer,* the court determined the statute to be constitutional and ruled against suppressing the evidence. In *Bentley,* the court found the statute to be unconstitutional and suppressed the evidence.

On appeal in the circuit court, these cases were

dants can contest the applicability of the statute to their unique facts when the cases return to trial court.

[3] If after an accident the driver of a vehicle involved in the accident is transported to a medical facility and a sample of the driver's blood is withdrawn at that time for the purpose of medical treatment, the results of a chemical analysis of that sample shall be admissible in a criminal prosecution for a crime described in subsection (1) to show the amount of alcohol or presence of a controlled substance or both in the person's blood at the time alleged, regardless of whether the person had been offered or had refused a chemical test. The medical facility or person performing the chemical analysis shall disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution as provided in this subsection. A medical facility or person disclosing information in compliance with this subsection shall not be civilly or criminally liable for making the disclosure.

[4] MCL 257.625a *et seq.*; MSA 9.2325(1) *et seq.*

consolidated. On February 27, 1987, Judge Gordon W. Britten found the statute to be unconstitutional under the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment, and suppressed the evidence.

The Court of Appeals granted leave to bring an interlocutory appeal, and on July 18, 1988, affirmed the decision of the circuit court, 170 Mich App 75; 428 NW2d 685 (1988) (McDONALD, J., concurring in the result only), holding that the statute violated the Fourth Amendment of the United States Constitution and the parallel Michigan provision. The Court found sufficient governmental involvement in the taking of the blood to invoke Fourth Amendment protections, and consequently determined that the searches did not fall within any of the exceptions to the search warrant requirement. The Court further held that federal and state equal protection guarantees were violated by the statute and ordered the test results suppressed.

However, on December 8, 1988, the Court of Appeals granted plaintiff's application for rehearing in light of *Murray v United States,* 487 US 533; 108 S Ct 2529; 101 L Ed 2d 472 (1988). On rehearing, the case was remanded to the district court to find a possible "independent source" to permit admission of the evidence. On September 1, 1989, plaintiff's request for clarification was granted, and the Court reaffirmed its position that an independent source for the evidence could be established in the lower court.

On December 28, 1989, this Court granted plaintiff's application for leave to appeal to decide whether the statute is constitutional and whether the test results should be suppressed. Defendants' application to cross appeal was subsequently granted to determine whether the Court of Ap-

peals correctly remanded the case to determine if an "independent source" existed for the evidence. 433 Mich 917 (1989).

### B. PEOPLE v ENGLAND

The events which gave rise to this case took place on June 8, 1985. At approximately 1:30 A.M., a two-vehicle collision occurred at the intersection of Hickory Ridge Road and Rose Center Road in Rose Township in Oakland County. Defendant was driving his Chevrolet truck when it collided with a Ford Tempo. The occupants of the Ford Tempo were killed, and defendant was seriously injured in the accident.

After the collision, defendant was transported to Hurley Medical Center. While in a semiconscious state, defendant's blood was drawn, and a blood alcohol analysis was performed, revealing an alcohol level over 0.10 percent.

Pursuant to subsection 9 of the implied consent act,[5] the prosecution obtained defendant's test results without a search warrant and without his consent. After the results were obtained, defendant was arrested. Following a bench trial, he was convicted of two counts of involuntary manslaughter pursuant to MCL 750.321; MSA 28.553. The trial court found that defendant failed to yield the right of way when his truck ran a stop sign and struck the Tempo.

Prior to trial, the trial judge denied defendant's motion to suppress the blood test results. After his conviction for involuntary manslaughter, defendant appealed in the Court of Appeals. The Court affirmed the conviction and rejected defendant's challenges to subsection 9 on Fourth Amendment and equal protection grounds. 176 Mich App 334;

---

[5] Subsection 9 is set out in full in n 3.

438 NW2d 908 (1989). The *England* Court explicitly declined to follow the analysis of the statute adopted by the *Perlos* Court. On June 9, 1989, defendant's motion for rehearing was denied.

Defendant's application for leave to appeal in this Court was granted to decide whether subsection 9 is constitutional, and whether the disputed test results should be suppressed. This case was consolidated with the *Perlos* cases. 433 Mich 917 (1989).

## II. FOURTH AMENDMENT CHALLENGE TO SUBSECTION 9

The first issue presented is whether subsection 9 of the implied consent act[6] survives constitutional scrutiny under US Const, Am IV and Const 1963, art 1, § 11.[7]

### A. REMOVAL OF BLOOD FOR TESTING

The initial inquiry must be whether the actual taking of the blood constituted a search or seizure under the Fourth Amendment. Clearly, a blood test conducted under the direction of police falls within the ambit of the Fourth Amendment. *Schmerber v California,* 384 US 757; 86 S Ct 1826;

---

[6] See n 3.

[7] Const 1963, art 1, § 11, in relevant part provides:

> The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation.

Unless there is a compelling reason to afford greater protection under the Michigan Constitution, the Michigan and federal provisions will be treated as affording the same protections. *People v Smith,* 420 Mich 1; 360 NW2d 841 (1984); *People v Nash,* 418 Mich 196; 341 NW2d 439 (1983). In this case, we find no compelling reason to afford greater protection under the Michigan Constitution.

16 L Ed 2d 908 (1966). However, before constitutional protections from searches and seizures can be activated, state action must be involved in the alleged search. See *United States v Jacobsen,* 466 US 109; 104 S Ct 1652; 80 L Ed 2d 85 (1984). In *Jacobsen,* the majority stated that the Fourth Amendment is inapplicable " 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.' " *Id.,* p 113, quoting *Walter v United States,* 447 US 649, 662; 100 S Ct 2395; 65 L Ed 2d 410 (1980) (Blackmun, J., dissenting).

In *Perlos,* the Court of Appeals found that there was sufficient state involvement to activate Fourth Amendment protections.[8] The Court held that a search and seizure improperly took place without a search warrant, and that none of the exceptions to the warrant requirement applied to authorize the prosecutorial action.[9] Thus, the statute was found to be unconstitutional.

---

[8] The Court stated:

In our view, there is very little distinction for Fourth Amendment purposes between a prior request that blood be withdrawn and tested and a statutory mandate that once blood is withdrawn and tested it must be turned over to the state.

Moreover, it is the involvement of the state rather than the purpose of the search that weighs most heavily toward a finding of state action. A private citizen acting with no state participation may seize evidence even when it is for the sole purpose of aiding a prosecution. In the present case, hospital personnel are statutorily required to turn over blood test results to the state for prosecution. . . . We believe there is sufficient governmental participation and authorization in the present case to constitute state action. [170 Mich App 75, 82-83; 428 NW2d 685 (1988).]

[9] Specifically, the *Perlos* Court considered the exigent circumstances and consent exceptions to the warrant requirement. The Court stated that exigent circumstances did not exist to justify the search of records without a warrant because the test had already been performed, and the results would be preserved long enough to obtain a

In *England,* the Court of Appeals considered the *Perlos* Court's analysis of this issue and rejected it. The *England* Court stated that the *Perlos* decision

fails to recognize the distinction between the withdrawal of the blood and the turning over of blood test results to the state.

The "search" performed here, i.e., the removal of the blood sample from defendant, was done strictly for purposes of medical treatment and not at the direction of the police, the prosecutor, or state agents. Thus, the actual removal of the blood sample is not a search protected by the Fourth Amendment, since state action is not involved. [176 Mich App 343-344.]

We agree with the distinction drawn by the *England* Court and its conclusion that the Fourth Amendment was not implicated when defendants had their blood withdrawn for medical treatment. Certainly there are various medical reasons for a doctor to order an alcohol analysis on a patient. For example, determining an alcohol level may be a necessary step for doctors to prescribe safe and effective medication. In these cases, blood was drawn for medical reasons, by medical personnel, and not in connection with any police investigation.[10] Subsection 9 of the implied consent act is

warrant. As to consent, the Court held that none of the defendants consented to the release of records to the state. Also, the Court stated that Michigan's implied consent law, MCL 257.625c; MSA 9.2325(3), could not impute the consent needed because any person has an absolute right to refuse a test under MCL 257.625d; MSA 9.2325(4), and defendants were not given an opportunity to refuse to submit to the tests.

[10] In addition to defendant Brown (see n 2), defendant England also disputes that his blood was drawn for medical treatment. We entertain serious doubts that his contention falls within the grant order in this case. We granted leave to appeal in *England* to decide "whether MCL 257.625a(9); MSA 9.2325(1)(9) is constitutional [and] whether the disputed test results should be suppressed. . . ." We are to determine,

not designed to influence the judgment of medical personnel regarding whether chemical analyses should be performed. Since there was no state involvement in the withdrawal and testing of defendants' blood, we find that there were no Fourth Amendment intrusions at this stage of the cases. In similar circumstances, other state courts have reached the same conclusion. See *State v Johnston,* 108 NM 778; 779 P2d 556 (1989); *Nelson v Alaska,* 650 P2d 426, 427 (Alas, 1982); *Wisconsin v Jenkins,* 80 Wis 2d 426, 427-434; 259 NW2d 109 (1977); *Turner v Arkansas,* 258 Ark 425, 435-437; 527 SW2d 580 (1975); *Oregon v Enoch,* 21 Or App 652, 654; 536 P2d 460 (1975); *Pennsylvania v Gordon,* 431 Pa 512, 517-519; 246 A2d 325 (1968), cert den 394 US 937 (1969).

### B. ACQUISITION OF BLOOD TEST RESULTS

Our second inquiry is whether the state's request and acquisition of blood test results without

if the statute is unconstitutional, whether the test results should be suppressed despite possible independent sources of admissibility, or a possible good-faith exception to the exclusionary rule. Our order did not call into question the Court of Appeals finding that the *England* case fell within the parameters of the statute.

Nonetheless, defendant England stipulated at trial that his blood was drawn for medical treatment:

Mr. Kozma [*Assistant Prosecutor*]: . . . It is hereby stipulated and agreed by and between the parties hereto, through their respective counsel, as follows:

One, that Dr. Norman Carter was the Emergency Room physician that supervised the Emergency Room Team that treated the Defendant, Trevor England.

*That it was under Dr. Carter's order that someone withdrew blood from the Defendant, for medical treatment.*

Mr. Kostin [*Defense Counsel*]: We have agreed to that, your Honor. [Emphasis supplied.]

Furthermore, defendant does not contend that the police directed or requested that the blood be drawn, and sufficient evidence was adduced at trial to show that the blood was drawn for medical purposes.

a search warrant infringed on defendants' Fourth Amendment privacy interests. In other words, did defendants have privacy interests in their blood alcohol test results? If no privacy interests existed, defendants do not have standing to challenge the government action.

The test to determine if a person has a protected Fourth Amendment privacy right is whether that person has a reasonable expectation of privacy in the area invaded by the government. *Katz v United States,* 389 US 347; 88 S Ct 507; 19 L Ed 2d 576 (1967).[11] The test was articulated by this Court in *People v Smith,* 420 Mich 1, 28; 360 NW2d 841 (1984), as "whether the defendant had an expectation of privacy in the object of the search and seizure and whether that expectation is one that society is prepared to recognize as reasonable." In discussing the parameters of the expectation test, the *Smith* Court stated:

> It offers no exact template that can be mechanically imposed upon a set of facts to determine whether or not standing is warranted. It does, however, provide the normal common-law value of general direction and practical flexibility. [*Id.,* p 26.]

The Court proceeded to cite with approval from Justice Powell's concurring opinion in *Rakas v Illinois,* 439 US 128, 152; 99 S Ct 421; 58 L Ed 2d 387 (1978), where he stated "[t]he ultimate question, therefore, is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances." Thus, the *Smith* Court determined that whether a person's expectation of privacy is reasonable should be

---

[11] This test has its origins in Justice Harlan's concurrence in *Katz.*

decided after considering the totality of the circumstances.[12]

The Court of Appeals in *Perlos* did not address whether a reasonable expectation of privacy existed in blood test results. However, in *England,* the Court found that the defendant's expectation of privacy was not reasonable, stating:

> By enacting subsection (9) of the implied consent statute, the Legislature has chosen to limit the scope of the evidentiary privilege. By doing so, the people of the State of Michigan, through the action of their Legislature, have indicated that they do not recognize a reasonable expectation of privacy in the results of a blood alcohol test taken from the driver of a car in an accident, where the test was administered by a hospital staff pursuant to medical treatment or diagnosis. [176 Mich App 345.][13]

Applying the reasonable expectation of privacy test to the instant case, we believe that defendants shared a subjective expectation that their test results would remain private. However, we do not believe that an expectation of privacy in blood alcohol test results, under these circumstances, is one which society is willing to consider reasonable.

Furthermore, we believe that a review of United States Supreme Court cases relating to third-party records supports our analysis. In *Couch v United States,* 409 US 322; 93 S Ct 611; 34 L Ed 2d 548 (1973), the petitioner challenged an IRS summons directed at her accountant to produce business records. The Court rejected the petitioner's argu-

---

[12] Justice BOYLE's opinion in *People v Catania,* 427 Mich 447, 457; 398 NW2d 343 (1986), also discusses the reasonable expectation of privacy test.

[13] Dealing with this issue, a later Court of Appeals opinion, *People v Crampton,* 180 Mich App 288, 292; 446 NW2d 626 (1989), expressly adopted the reasoning of the Court in *England.*

ments that she had a protected interest in tax records in the hands of her accountant. Justice Powell noted that no "confidential accountant-client privilege" existed under federal law, *id.,* p 335. The Court found no justifiable expectation of privacy because much of the summons information was required to be disclosed on tax returns and would not remain private. The Court also noted that the tax system was dependent on "honest self-reporting" to survive.

In *United States v Miller,* 425 US 435; 96 S Ct 1619; 48 L Ed 2d 71 (1976), the Bank Secrecy Act of 1970 mandated that banks maintain certain transactional records.[14] The Treasury Department subpoenaed all bank records connected with the respondent's activities. The respondent was subsequently convicted of tax-related crimes arising from an illegal liquor manufacturing operation. The respondent challenged the subpoena on the ground that it constituted a search and seizure of his "private papers." *Id.,* p 440.

The Court held that the respondent had no reasonable expectation of privacy in the records. The Court reasoned that the records belonged to the bank and that the respondent could not claim ownership or possession of the records. Also, the subpoenaed checks and deposit slips were not of a confidential nature, but were financial documents to be used in commercial transactions. The Court reasoned that no legitimate expectation of privacy existed because the information was voluntarily exposed to the bank's employees in the ordinary course of business. Also, the Court stated that Congress did not perceive any legitimate expectation of privacy in the records because the purpose of the act was to maintain records which "have a

---

[14] 12 USC 1829b(d).

high degree of usefulness in criminal, tax, and regulatory investigations and proceedings." 12 USC 1829b(a)(1).

Lastly, the *Miller* Court stated:

> The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.[15] [425 US 443.]

Several state courts have also dealt with similar issues regarding privacy rights in medical records or blood samples. In *Wisconsin v Jenkins, supra,* the defendant was charged with negligent homicide as a result of using a motor vehicle while intoxicated. The defendant was in and out of consciousness after an accident, and his blood was drawn without his consent for purposes of medical treatment. The prosecution somehow obtained the results prior to the defendant's arrest. The doctor who ordered the chemical analysis testified at the defendant's preliminary examination, and the defendant was bound over for trial. The defendant challenged the admissibility of the test results on Fourth Amendment grounds, but the Supreme Court of Wisconsin allowed admission of the evi-

---

[15] The Court stated that it declined to address the issue of evidentiary privileges in the context of this statement. *Id.* at 443, n 4.

A similar rationale was employed in *Smith v Maryland,* 442 US 735; 99 S Ct 2577; 61 L Ed 2d 220 (1979), where the Court held that the petitioner had no reasonable expectation of privacy in phone numbers dialed from his private residence. The petitioner assumed the risk in using his phone that information transmitted to the phone company might be conveyed to the government.

dence. The court held that no reasonable expecta-
tion of privacy existed either in the doctor's testi-
mony or the test results. The basis of the court's
decision was a Wisconsin statute which precluded
the physician-patient privilege from applying in
homicide trials.

In *Pollard v State,* 439 NE2d 177 (Ind App,
1982), the defendant appealed his conviction for
driving while intoxicated which resulted in the
death of another person. After a collision, the
defendant's blood was drawn at a hospital for
medical treatment. Although they had probable
cause, the prosecution later subpoenaed the blood
sample without a search warrant. The court noted
that a state statute exempted blood alcohol test
results from the physician-patient privilege. The
court dismissed the defendant's Fourth Amend-
ment challenge to the use of the results by noting
that the blood sample was not privileged and was
taken from the hospital, not the defendant. The
defendant could "not claim the right of another to
be free from search and seizure." 439 NE2d 183.

In *State v Fears,* 659 SW2d 370 (Tenn Crim App,
1983), cert den 465 US 1082 (1984), the defendant
was convicted of aggravated rape, and challenged
a subpoena of his medical records on Fourth
Amendment grounds. The court relied on *United
States v Miller, supra,* in rejecting the defendant's
argument. It found that the defendant did not
have a reasonable expectation of privacy in re-
cords owned and possessed by the hospital, citing
*Miller* for the proposition that information re-
vealed to a third party, even for a limited purpose,
can be conveyed to the government without violat-
ing Fourth Amendment rights.

The defendant was convicted of causing death by
use of an automobile in *State v Dyal,* 97 NJ 229,
232; 478 A2d 390 (1984). After a collision, the

defendant consented to a blood test for medical treatment. Four days later, the prosecutor subpoenaed the results. The court balanced the physician-patient privilege against the public interest in prosecuting drunken driving cases and determined that a "reasonable basis" to believe the defendant had been drinking was required to subpoena the test results. Although the privilege clearly applied, the public interest required a mitigation of the probable cause standard. In tending to emergency duties at the scene of an accident, police may not have time to accompany an injured person to a hospital to supervise a blood test. The court also noted that it was more likely that injured parties would receive prompt medical attention if the police did not feel compelled to establish probable cause at the scene of an accident.[16]

---

[16] Other state cases have disallowed use of test results in similar situations. In *State v Copeland,* 680 SW2d 327 (Mo App, 1984), the defendant was charged with driving a motor vehicle while intoxicated. A collision occurred, after which the defendant was taken to a hospital, and his blood was withdrawn for medical treatment. The police arrived later, requested, and were given a sample of the defendant's blood. The court held that the defendant had a legitimate expectation of privacy in the blood sample because law, custom, and common practice demanded that information revealed in the physician-patient relationship be kept confidential. The court noted that the physician-patient privilege applied to the case and declined to apply a new Missouri statute which removed the privilege in trials relating to drunken driving offenses.

The court stated "[w]hether the expectation of privacy in blood or the results of tests on it has now been changed, see § 577.037.1 [Mo Rev Stat, 1983 supp], we do not decide as that statute was enacted after defendant's blood was taken." 680 SW2d 329.

More recently, in *Commonwealth v Hipp,* 380 Pa Super 345; 551 A2d 1086 (1988), blood was withdrawn from the defendant for medical treatment. Later on, the police requested that medical personnel perform a blood test, but a technician volunteered the earlier results. These results were used at trial against the defendant to convict him of driving under the influence of alcohol. The court found that the use of the records was justified by probable cause, despite the fact that the defendant had a reasonable expectation of privacy in the medical records, and that his interest was protected by the Fourth Amendment and a parallel state provision. The origin of the privacy right was identified by the court as a provision of the Pennsylvania Consti-

We also look to other analogous statutes to gauge the propriety of the law in question. Government frequently imposes obligations on third parties to report information evidencing suspicious or criminal activity. The United States Supreme Court in *Whalen v Roe,* 429 US 589; 97 S Ct 869; 51 L Ed 2d 64 (1977), considered the constitutionality of a New York reporting statute. The statute required that physicians report to the State Department of Health the names and addresses of those persons using dangerous prescription drugs. Physicians also had to identify the prescribing physician and the pharmacy, and report the type and amount of the drug prescribed. The primary purposes of the act were to acquire information and to prevent unlawful use and diversion of hazardous drugs. In upholding the law against challenges by doctors and patients, the Court said that the disclosures were not

> meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care. Unquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention. Nevertheless, disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy. [*Id.* at 602.]

tution (art 1, § 1). In pertinent part, the provision states that "[a]ll men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation . . . ."

Indeed, many institutions demand the use of personal medical information for a variety of reasons, and these uses serve important societal functions.[17]

After finding no Fourteenth Amendment violation, the Court rejected a Fourth Amendment challenge to the statute, stating that cases finding such a privacy right

> involve affirmative, unannounced, narrowly focused intrusions into individual privacy during the course of criminal investigations. We have never carried the Fourth Amendment's interest in privacy as far as the *Roe* appellees would have us. We decline to do so now. [*Id.* at 604, n 32.]

A similar type of reporting act is the Bank Secrecy Act and corresponding regulations which require financial institutions to report suspicious banking activity. One such provision is that currency transactions over $10,000 have to be reported.[18] In *California Bankers Ass'n v Shultz,* 416 US 21; 94 S Ct 1494; 39 L Ed 2d 812 (1974), the Supreme Court upheld this reporting requirement in the face of a Fourth Amendment challenge by banking institutions. In *United States v Kaatz,* 705 F2d 1237 (CA 10, 1983), the court upheld the reporting provision against a Fourth Amendment challenge by a bank customer who claimed a privacy interest in bank records, citing *United States v Miller, supra,* in rejecting the customer's argument.

---

[17] Such information is used by public health agencies, medical and social researchers, social programs, employers, insurance companies, government agencies, educational institutions, judicial process, law enforcement, credit investigative agencies, licensing agencies, and the media. This is not an exhaustive list. Gellman, *Prescribing privacy: The uncertain role of the physician in the protection of patient privacy,* 62 NC L R 255 (1984).

[18] See 31 USC 5313 and 31 CFR 103.22.

On the state level, all states have child protection statutes which require that suspected child abuse be reported to state or local authorities.[19] Michigan's law, MCL 722.623; MSA 25.248(3), requires therapists, doctors, psychologists, teachers, and many others to report suspected child abuse to state authorities. In *People v Cavaiani,* 172 Mich App 706; 432 NW2d 409 (1988), lv den 432 Mich 853 (1989), the Court of Appeals rejected the defendant therapist's argument that the statute violated his Fourth Amendment rights and those of his patients. Similar legislation placing a reporting obligation on medical institutions is MCL 750.411; MSA 28.643, which requires that medical personnel report wounds inflicted by deadly weapons to local authorities.

Applying the reasonable expectation of privacy test to *Perlos* and *England,* we believe that defendants shared a subjective expectation that their test results would remain private. Generally, information relating to medical treatment falls under the physician-patient privilege, and remains confidential.[20]

However, we do not believe that an expectation of privacy in blood alcohol test results, under these circumstances, is one which society is willing to consider reasonable. To assess the objective aspect

---

[19] Coleman, *Creating therapist-incest offender exception to mandatory child abuse reporting statutes—When psychiatrist knows best,* 54 U Cinn L R 1113 (1986). Many of these statutes abrogate the physician-patient privilege.

[20] MCL 600.2157; MSA 27A.2157 provides in part:

Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon.

of this test we must consider the totality of the circumstances in searching for "understandings that are recognized and permitted by society."[21].

Although not determinative, one source in analyzing the reasonableness of an expectation is to look to the Legislature. In *Jenkins* and *Pollard,* finding no Fourth Amendment interest, the courts acknowledged that state statutes exempted the physician-patient privilege in those circumstances.[22] Also, as part of its analysis, the United States Supreme Court in *United States v Miller, supra,* noted that Congress did not consider reasonable an expectation of privacy in bank records because of their usefulness in criminal, tax, and regulatory investigations. Likewise, we are persuaded that in Michigan, under subsection 9, the Legislature does not consider reasonable an expectation of privacy in blood alcohol test results. The Legislature decided to abrogate the physician-patient privilege by granting prosecutors access to test results.[23] Nor has the Legislature abolished a longstanding common-law right by creating an

[21] *Rakas v Illinois, supra,* p 144, n 12.

[22] In *State v Copeland,* n 16 *supra,* the Missouri Court of Appeals found a Fourth Amendment interest in a blood sample, but the court declined to apply a new Missouri statute which would have excepted the privilege in that case.

[23] In *People v Traylor,* 145 Mich App 148, 151; 377 NW2d 371 (1985), the Court found that the physician-patient privilege had been impliedly amended by MCL 750.411; MSA 28.643, which requires that wounds inflicted by deadly weapons be reported to local police authorities. The Court stated:

When a general statute, such as the one creating the privilege, conflicts with a specific statute, such as the reporting statute, the specific statute is considered to be an exception to the general statute. [Citation omitted.]

See also *People v Cavaiani, supra,* where the Court of Appeals found a child abuse reporting provision to be a legislative exception to the privilege.

Further support can be found in 1A Sands, Sutherland Statutory Construction (4th ed), § 23.09, p 331.

exception to the privilege. The physician-patient privilege is a statutorily created right which did not exist at common law. See *New York Life Ins Co v Newman,* 311 Mich 368; 18 NW2d 859 (1945), and *People v Boucher,* 131 Mich App 216; 345 NW2d 670 (1983). In fact, the privilege is subject to many exceptions in states where it exists by virtue of statute.[24]

By enacting subsection 9, the Legislature has acted consistently with other provisions of the implied consent act in expressing its belief that when people drive, they encounter a diminished expectation of privacy. For example, under MCL 257.625c; MSA 9.2325(3), a person is presumed to have given consent to blood, urine, or breath tests if arrested for any of various offenses related to driving under the influence of alcohol or controlled substances. Under MCL 257.625a(6); MSA 9.2325(1)(6), if a person refuses the request of a peace officer to submit to a blood, breath, or urine test, the person's operator's license will be suspended, and six points added to that person's driving record.

Furthermore, it is apparent there is a strong public interest reflected in subsection 9 of the implied consent act. We believe society is aware of the need for effective laws to curtail drunken driving. Intoxicated drivers take a devastating human and financial toll each year. In 1988, in Michigan alone, there were 705 fatal traffic accidents that were alcohol related. Those accidents claimed 793 lives, 46.5 percent of the total highway deaths that year.[25] Nor is this a recent prob-

[24] McCormick, Evidence (3d ed), §§ 98, 101-104, pp 243-246, 249-258; 8 Wigmore, Evidence (McNaughton rev), § 2380, ns 3, 5, 6, §§ 2388-2391, pp 819-828, 853-868.

[25] Department of State Police, *Alcohol related fatal motor vehicle traffic accident study Michigan,* January-December, 1988.

lem. Throughout the nation, state legislatures have been wrestling with this tragic problem for decades.[26]

We are persuaded that the public interest is furthered by this act because it facilitates the prosecution of drunken drivers and insures that drivers who are injured in automobile accidents will get prompt medical attention because police will be less inclined to detain an injured driver for criminal investigation.

We find subsection 9 to be a carefully tailored statute which only allows chemical test results to be turned over to the state under narrowly defined circumstances, if the state requests them. For the statute to apply there first must be an accident, a person must be taken to a medical facility, the person must have been the driver of a vehicle involved in the accident, and medical personnel must order a chemical analysis, on their own initiative, for medical treatment. This is not a sweeping abandonment of the physician-patient privilege. Prosecutors can only gain access to chemical test results. They cannot obtain all of a person's medical records, nor can they obtain a blood sample for their own discretionary testing. Consequently, within narrow parameters, the Legislature has created a minor exception to the physician-patient privilege. Thus, we conclude that

[26] In *Breithaupt v Abram,* 352 US 432, 439; 77 S Ct 408; 1 L Ed 2d 448 (1957), the United States Supreme Court stated:

Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

the scope of the enactment does not amount to an authorization for government intrusion on defendants' Fourth Amendment interests.

Furthermore, we agree with the rationale underlying *United States v Miller* suggesting that there is no objectively reasonable expectation of privacy in the test results. Clearly, defendants cannot claim ownership or possession of the results. Also, as stated in *Miller,* information revealed to a third party, even for a limited purpose, can properly be conveyed to the government even if the information was revealed in confidence. In these cases, blood was taken for a limited purpose, medical treatment. As in *Miller,* in both *Perlos* and *England,* the information conveyed was not privileged. Under the *Miller* analysis, once the hospitals obtained the results for medical purposes,[27] it would have been unreasonable for defendants to assume that the results would necessarily remain private.[28] At the very least, various hospital employees become aware of the test results in the normal course of their work. Society places a risk on persons in their dealings with third parties that information conveyed to third parties will not remain private. Moreover, while in *Miller* the government was allowed access to all of the respondent's bank records, in the instant case, the state could only obtain an extremely limited and well-defined portion of defendants' overall medical records.

In summary, we find persuasive statutory analo-

---

[27] The last sentence of subsection 9 states, "[a] medical facility or person disclosing information in compliance with this subsection shall not be civilly or criminally liable for making the disclosure." We do not read this sentence as granting immunity to medical personnel for unauthorized "taking" of blood. In other words, medical personnel must still act responsibly and in accordance with the law in acquiring blood samples.

[28] Note the many social uses for medical information in n 17. See also *Whalen v Roe, supra.*

gies in the reporting acts related to prescription drugs, child abuse, deadly weapon injuries, and financial activity. These statutes impose obligations on third parties to report to the government certain types of information which they might happen upon during the ordinary course of their jobs. Much of this information is personal medical or financial data. These statutes are commonly used and relied on. An efficient information gathering tool, this type of statute is effective in helping government to effectuate its priorities. We view the prevalence of reporting statutes as clear evidence that society recognizes as reasonable laws which oblige third parties to report certain sensitive information to the government. Furthermore, we note that these statutes have consistently withstood constitutional challenges.

Subsection 9 is comparable to the reporting acts to the extent it imposes obligations on medical personnel to turn over information to the government which they acquire during the ordinary course of their jobs. In addition, unlike the reporting acts which impose blanket obligations, under subsection 9 the obligation to turn over information is only activated upon request by the state.

By our decision today, we do not hold that unrestricted access to medical records is outside the scope of Fourth Amendment protection. Rather, we hold that defendants do not have a protected Fourth Amendment interest in blood alcohol test results under the circumstances presented by these cases. Any expectation of privacy defendants may have had in the test results was unjustified, given societal concerns with regard to drunken driving, the Legislature's implied amendment of the physician-patient privilege, and the resulting minimal intrusion on defendants. In so holding, we also recognize that defendants, in

conveying information to the hospitals, assumed the risk that the hospitals might disclose information to the state. We find that MCL 257.625a(9); MSA 9.2325(1)(9) does not violate US Const, Am IV or Const 1963, art 1, § 11.

### III. EQUAL PROTECTION CHALLENGE TO SUBSECTION 9

The next issue we must address is whether subsection 9 is constitutionally valid under the Equal Protection Clauses of US Const, Am XIV and Const 1963, art 1, § 2.

This Court, in *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975), discussed equal protection challenges to legislation. In pertinent part, the Court stated:

> If the interest is "fundamental" or the classification "suspect," the court applies a "strict scrutiny" test requiring the state to show a "compelling" interest which justifies the classification. Rarely have courts sustained legislation subjected to this standard of review.
>
> Other legislation, principally social and economic, is subjected to review under the traditional equal protection test. The burden is on the person challenging the classification to show that it is without reasonable justification. It has been said that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." A classification will stand unless it is shown to be "essentially arbitrary." Few statutes have been found so wanting in "rationality" as to fail to satisfy the "essentially arbitrary" test.

In *Perlos,* the Court of Appeals held that the defendants' fundamental right to be free from unreasonable searches and seizures had been violated. Therefore, a strict scrutiny analysis was

employed, and the Court found that the statute violated equal protection guarantees. The Court also held that the statute would not survive a rational-basis analysis:

> We find no reasonable or rational basis for denying conscious drivers who are in the hospital the same opportunity to refuse a blood test as is given to conscious drivers who are not in the hospital. [170 Mich App 89-90.]

We do not agree. We find that no fundamental Fourth Amendment right was violated by the statute. Furthermore, we are persuaded that treating hospitalized individuals who are not under arrest differently from arrested drivers who are not in the hospital does not raise the level of examination to strict scrutiny. Thus, we conclude that hospitalized persons, not under arrest, do not constitute a "suspect" class.

Subsection 9 can be classified as "principally social and economic" legislation. Therefore, our inquiry is whether the "classification itself is rationally related to a legitimate governmental interest." *United States Dep't of Agriculture v Moreno,* 413 US 528, 533; 93 S Ct 2821; 37 L Ed 2d 782 (1973).

We agree with the Court of Appeals in *England:*

> One possible rational basis is safety. If statutory procedure requires a driver involved in an accident to be arrested before the blood alcohol test were administered, the procedure would lead to delays in treatments for injured drivers while the arresting officers took the steps necessary for a legal arrest. Second, in an attempt to combat the tremendous cost in lives and property damage to our society, the Legislature has chosen "to ease the prosecution of drunk drivers [who have been involved in an accident] by making the results of

blood alcohol tests performed by hospitals available to prosecutors, without the use of otherwise cumbersome procedures." *People v Stoney,* 157 Mich App 721, 726; 403 NW2d 212 (1987). [176 Mich App 347-348.]

The Court then cited *O'Donnell v State Farm Mutual Automobile Ins Co,* 404 Mich 524, 542; 273 NW2d 829 (1979), where this Court stated:

"If it be said, the law is unnecessarily severe, and may sometimes do injustice, without fault in the sufferer under it, our reply is: these are considerations that may very properly be addressed to the legislature, but not to the judiciary—they go to the expediency of the law, and not to its constitutionality."

The responsibility for drawing lines in a society as complex as ours—of identifying priorities, weighing the relevant considerations and choosing between competing alternatives—is the Legislature's, not the judiciary's. Perfection is not required:

"[T]he drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one. Perfection in making the necessary classifications is neither possible nor necessary."

One reasonable basis underlying subsection 9 is safety. By "easing the prosecution" of drunken drivers, the Legislature has paved the way for safer travel in Michigan. We find that subsection 9 is rationally related to a legitimate state interest. Accordingly, we hold that subsection 9 of the implied consent act is constitutional under US Const, Am XIV, § 1 and Const 1963, art 1, § 2.

### IV. CONCLUSION

We hold that subsection 9 of the implied consent

act is constitutionally valid under US Const, Am IV and Const 1963, art 1, § 11, and the Equal Protection Clauses of US Const, Am XIV and Const 1963, art 1, § 2. Therefore, the test results were improperly suppressed in the *Perlos* cases. Because we find subsection 9 to be constitutional under the Fourth Amendment and the Equal Protection Clause, we find it unnecessary to reach the issues whether the evidence should be suppressed and whether the Court of Appeals in *Perlos* properly remanded the case. We reverse the decision of the Court of Appeals in *Perlos,* and we remand the *Perlos* cases to the district court. We affirm the decision of the Court of Appeals in *England.*

BRICKLEY, BOYLE, and GRIFFIN, JJ., concurred with RILEY, C.J.

LEVIN, J. (*dissenting*). The question presented concerns the constitutionality of an amendment of § 625a of the Michigan Vehicle Code providing that if after an accident the driver of a motor vehicle involved in the accident is transported to a medical facility and a sample of his blood is withdrawn at the time for the purpose of medical treatment, the results of the chemical analysis of that sample shall be admissible in a criminal prosecution for certain crimes there described to show the amount of alcohol or presence of a controlled substance, and that

> [t]he medical facility or person performing the chemical analysis shall disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution as provided in this subsection.[1]

---

[1] The amendment was enacted by 1982 PA 310 which added subsection (9) to § 625a. MCL 257.625a(9); MSA 9.2325(1)(9).

We would hold that the quoted language, requiring the medical facility or person performing a chemical analysis to disclose the results of the analysis to a prosecuting attorney who requests the results for use in a criminal prosecution, is unconstitutional.[2]

The statute authorizes a search by the state without a warrant of a person's medical records without a showing of probable cause and exigent circumstances.[3]

The majority declares that a driver does not have a reasonable expectation of privacy in the results of a chemical analysis because "we do not believe that an expectation of privacy in blood alcohol test results, under these circumstances, is one which society is willing to consider reasonable."[4]

There is the nub of our disagreement. The ma-

[2] In each of the consolidated cases, the results of the chemical analysis were provided pursuant to a request made on the basis of the quoted language before the commencement of a criminal prosecution. We thus see no need to express an opinion whether the results of the chemical analysis would be admissible in a criminal prosecution were the results obtained other than on the basis of the quoted language.

[3] *Breithaupt v Abram,* 352 US 432; 77 S Ct 408; 1 L Ed 2d 448 (1957), was decided before the federal Search and Seizure Clause was made applicable to the states through the Fourteenth Amendment. In *Schmerber v California,* 384 US 757, 768; 86 S Ct 1826; 16 L Ed 2d 908 (1966), decided after *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), made the federal search and seizure exclusionary rule applicable in state court criminal prosecutions, the Court said "there was plainly probable cause for the officer to arrest petitioner and charge him with driving an automobile while under the influence of intoxicating liquor," and that there were exigent circumstances justifying the officer directing the taking of a blood sample without a search warrant.

[4] *Ante,* p 318.

See *People v Smith,* 420 Mich 1, 28; 360 NW2d 841 (1984), relied on and quoted in the majority opinion (*ante,* p 317), stating that in determining whether "a defendant may attack the propriety of a search or seizure," "the court must decide whether the defendant had an expectation of privacy in the object of the search and seizure and whether that expectation is one that *society is prepared to recognize as reasonable.*" (Emphasis added.)

jority states: "we believe that defendants shared a subjective expectation that their test results would remain private."[5] We do not agree that such an expectation is one that society is unwilling to consider reasonable. We are of the opinion that society considers such an expectation to be reasonable[6] and, therefore, absent exigent circumstances, a person's medical records may not be obtained without a warrant.

A person's medical records are an intensely personal matter. Few persons would willingly share their medical records with the state. In today's society, a person has little choice but to undergo medical treatment at a medical facility, generally licensed by and authorized to operate by the state. Few persons have the ability to obtain medical treatment in their homes, and even such persons would, of necessity, employ physicians and other medically trained persons who would be subject to the statutory edict.

A driver does not consent to a search by the state of his medical records for the results of a chemical analysis of his blood by ingesting alcoholic beverages or a controlled substance, driving a motor vehicle, becoming involved in an automobile accident, permitting himself to be transported to a medical facility, or allowing a sample of his blood to be withdrawn for the purpose of medical treatment.

Under the circumstance that a person who becomes involved in an automobile accident, in need of medical treatment, ordinarily has no choice but to permit himself to be transported to a medical facility and to allow blood to be withdrawn for the

[5] *Ante,* p 318.

[6] Cf. *State v Copeland,* 680 SW2d 327, 330 (Mo App, 1984) (dictum); *Commonwealth v Hipp,* 380 Pa Super 345, 354-355; 551 A2d 1086 (1988) (dictum).

purpose of emergent medical treatment, and having in mind the intensely personal nature of medical records, the permission granted by the driver for such purpose—to the medical facility[7] and not to the state—differs from lodging, in nonemergent circumstances, tax records with an accountant,[8] or financial records with a bank.[9] Nor are a person's medical records like garbage left for collection at the curb outside the curtilage of the home.[10]

Nor do we think it of importance that the Legislature, by enacting the amendment of § 625a, has expressed a policy of permitting a search of medical records for the purpose of obtaining the results of chemical analysis of a driver's blood. The constitutional protection against unreasonable searches and seizures is a limitation on the power of government that cannot be avoided by legislative decree. While the Legislature may have the power to modify the physician-patient privilege, it does not have the power to modify the scope of the Search and Seizure Clause.

We note in conclusion that in *Whalen v Roe,* 429 US 589, 605-606; 97 S Ct 869; 51 L Ed 2d 64 (1977), where the Court sustained the constitutionality of a statute requiring that physicians identify patients obtaining certain prescription drugs so that their names and addresses could be recorded in a centralized computer maintained by the state, the Court said:

---

[7] To be sure, the medical facility or person performing the chemical analysis is not the state. Were they to disclose the results of the chemical analysis without the constraint of statute, a different question would be presented.

[8] See *Couch v United States,* 409 US 322; 93 S Ct 611; 34 L Ed 2d 548 (1973).

[9] See *United States v Miller,* 425 US 435; 96 S Ct 1619; 48 L Ed 2d 71 (1976).

[10] See *California v Greenwood,* 486 US 35; 108 S Ct 1625; 100 L Ed 2d 30 (1988).

A final word about issues we have not decided. We are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information in computerized data banks or other massive government files. The collection of taxes, the distribution of welfare and social security benefits, the supervision of public health, the direction of our Armed Forces, and the enforcement of the criminal laws all require the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. Recognizing that in some circumstances that duty arguably has its roots in the Constitution, nevertheless New York's statutory scheme, and its implementing administrative procedures, evidence a proper concern with, and protection of, the individual's interest in privacy. We therefore need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data—whether intentional or unintentional—or by a system that did not contain comparable security provisions. We simply hold that this record does not establish an invasion of any right or liberty protected by the Fourteenth Amendment.[11]

CAVANAGH and ARCHER, JJ., concurred with LEVIN, J.

---

[11] Justice Brennan filed a separate concurring opinion stating that the statute did not, on its "face, amount to a deprivation of constitutionally protected privacy interests, any more than the more traditional reporting provisions." *Id.* at 607.